## MAYOLA v. UNITED STATES. *
### No. 7170.

Circuit Court of Appeals, Ninth Circuit.

May 31, 1934.

As Modified on Denial of Rehearing July 19, 1934.

*Rehearing denied July 19, 1934.

Chauncey F. Tramutolo and Lemuel D. Sanderson, both of San Francisco, Cal., for appellant.

H. H. McPike, U. S. Atty., and W. E. Licking, Asst. U. S. Atty., both of San Francisco, Cal.

Before WILBUR, SAWTELLE, and GARRECHT, Circuit Judges.

GARRECHT, Circuit Judge.

Jose Mayola was found guilty of conspiracy to counterfeit $10 gold certificates of the United States. There were twelve counts in the indictment and verdict of not guilty was returned on all but the conspiracy count. From the judgment and sentence entered thereon Mayola appeals. Also named as defendants were Albert A. Armstrong and Edward A. Campbell. The evidence connected one Herbert L. Walkup with the conspiracy. He committed suicide before arrest. It is through association with Walkup that Mayola became involved in the case.

In September, 1931, Walkup, owner of the Walkup Map Company in San Francisco, was in serious financial straits. He made the acquaintance of defendant Armstrong and one Johnson. In October he suggested that they go to South America and counterfeit Colombia money. They refused. Prior to this defendant Campbell had requested

one Richard Dineley to introduce him to the consul of some Central American country so that he could broach a scheme for counterfeiting foreign bonds or money. Dineley secretly advised the agents of the United States Secret Service, and kept them informed. A camera and a printing press were purchased. The press was set up in Walkup's home and the camera in Walkup's shop. A proof of a counterfeit Colombian bill was struck and Campbell presented it to Dineley, who rejected it as inferior. Armstrong and Campbell quarreled and Armstrong ordered Campbell to leave, which he did. Following this, preparations were made to counterfeit $10 gold certificates of the United States. A total of 1,260 bills were printed. Walkup told Armstrong that he was going to take all the bills to Panama where he would dispose of them at 25 per cent. of their face value, or about $3,000, return to San Francisco, and form a partnership in a legitimate lithographing business with Armstrong. One of the counterfeit bills was passed in San Francisco on April 6, 1932, which on the next day came into possession of the Federal Reserve Bank of San Francisco. On April 7th, Mayola withdrew $1,000 from the Hibernia Bank, and either gave or loaned $500 of it to Walkup. Both separately bought tickets and embarked for Panama on April 9, 1932, occupying the same stateroom. At that time Walkup had the 1,260 counterfeit bills on his person in a homemade money belt. Later he returned from Panama with 300 of the bills still in his possession. He told Armstrong that he had left the remainder of the bills in Panama and had received nothing for them. Together they burned the remaining 300 bills. On July 27, 1932, secret service agents searched the Walkup home and office and seized the materials and paraphernalia, and on the same day Walkup suicided.

The facts, above set forth, are undisputed.

The government sought to connect Mayola with the conspiracy and introduced testimony as to statements made by the deceased, Herbert L. Walkup. This evidence was received over the objection of appellant and exception reserved. These rulings constitute all the assignments of error, save four. Three of these latter related to questions asked Armstrong, who pleaded guilty, and the other is directed to the admission in evidence of two conflicting statements made by Walkup in the presence of government officers. and reduced to writing and signed by him.

Helen Walkup, wife of the deceased Herbert L. Walkup, appeared as witness for the government and during direct examination was asked the following question: "What did Mr. Walkup say?" This was objected to on the ground of hearsay, the objection overruled and the question answered as follows: "He told me that Mr. Mayola said that it would be best if they carried their counterfeit bills on them, under their clothes and that it would be better for Mr. Walkup to carry them, because Mr. Mayola was a larger man and all that around his waist would make him look much larger than normal. I told Mr. Walkup that I thought he was being foolish in taking it all."

Later Mrs. Walkup was asked: "What did he [Mr. Walkup] say?" This was objected to on the ground of hearsay, the objection was overruled, and the answer, as follows: "Two or three days before the date of sailing Mr. Walkup told me that Mr. Mayola had agreed to give him $500 out of which Mr. Walkup stated that he was to give Mr. Armstrong some and the remainder was to finance Mr. Walkup's trip to take the bills down." The prosecuting attorney asked Mrs. Walkup this question: "Between February, 1932, and April 9, the date of sailing for South America, did Mr. Walkup tell you anything about conversations with Mr. Mayola concerning counterfeit money?" The objection that the question was leading and suggestive was overruled. The answer was: "Around in March Mr. Walkup told me that Mr. Mayola might take him to South America with him to dispose of the money."

She was asked: "Did he [Mr. Walkup] mention names of other persons to be concerned with that counterfeit money?" To this, objection was made upon the ground that the conspiracy terminated after the money was made but it was also overruled. She testified that: "He said Mr. Mayola knew someone in South America who could handle it."

And again, with reference to the homemade money belt: "Whom did he say made it?" The objection of hearsay was made and the same ruling had. She answered: "Mr. Walkup told me that Mrs. Mayola had made it."

Another question asked the same witness was: "Did he [Mr. Walkup] mention the name of that party in South America?" The objection of "hearsay" was overruled. She answered: "He told me that Mr. Mayola introduced him to two men Sisto Posso and Senor Ibanez, in South America, who wanted to handle the money if it was good."

The above questions and answers, together with the objections, rulings, and exceptions thereto are properly assigned as error.

There can be no question that the answers of the witness were most prejudicial. And if they were not in furtherance of the object of the conspiracy, but merely narratives of past events—the husband telling his wife of the day's happenings—it was error to admit such evidence.

In Logan v. U. S., 144 U. S. 263, 308, 12 S. Ct. 617, 632, 36 L. Ed. 429, Mr. Justice Gray, speaking for the court, said: "The court went too far in admitting testimony on the general question of conspiracy. Doubtless, in all cases of conspiracy, the act of one conspirator in the prosecution of the enterprise is considered the act of all, and is evidence against all.· U. S. v. Gooding, 12 Wheat, 460, 469 [6 L. Ed. 693]. But only those acts and declarations are admissible under this rule which are done and made while the conspiracy is pending, and in furtherance of its object." Brown v. U. S., 150 U. S. 93, 98, 14 S. Ct. 37, 37 L. Ed. 1010. To the same effect is U. S. v. Goldberg et al., 25 Fed. Cas. pp. 1342, 1345, No. 15,223, "The act must be one, you will observe, to effect the object of the conspiracy. * * *"

Isenhouer et al. v. U. S., 256 F. 842 (C. C. A. 8), says that the rule above stated is an old one. Morrow et al. v. U. S., 11 F.(2d) 256, 259 (C. C. A. 8) reiterates the rule and cites especially Brown v. U. S., supra, in addition to numerous other cases. In this circuit in Sugarman v. U. S., 35 F.(2d) 663, 665 (C. C. A. 9) it is said that: "* * * the true rule is that acts and declarations of one conspirator, in furtherance of the object of the conspiracy and during its existence, are binding on all members of the conspiracy, whether present or absent. * * *" See, also, U. S. v. Renda et al., 56 F.(2d) 601 (C. C. A. 2); Van Riper v. U. S., 13 F.(2d) 961, 967 (C. C. A. 2). This latter case holds that: "* * * For this reason, merely narrative declarations are not competent. * * *" Obviously, the statements and declarations made by Mr. Walkup to his wife were of this classification, merely narrative.

Appellee cites Jones v. U. S. (C. C. A.) 179 F. 584, 601, of this circuit, as authority for holding that it is not necessary that the statements in question be in furtherance of the object of the conspiracy; but that doctrine, if such it may be called, has not been adhered to, as appears from the concurring opinion of the majority of this court in Romeo v. U. S., 23 F.(2d) 551, 553, which is in harmony with the weight of authority.

There is another reason for the rejection of this testimony. It is held, in Kuhn v. U. S., 26 F.(2d) 463 (C. C. A. 9), that the declarations of one coconspirator to another are not competent to establish the connection of a third person with the conspiracy. This is followed in Minner v. U. S., 57 F.(2d) 506, 511 (C. C. A. 10), and again by the same circuit in Thomas v. U. S. (C. C. A.) 57 F.(2d) 1039, 1041. The Circuit Court of Appeals for the Sixth Circuit, in Nibbelink v. U. S., 66 F.(2d) 178, 179, following, but not citing, Pope v. U. S., 289 F. 312, 315 (C. C. A. 3), and Kelton v. U. S., 294 F. 491, 495 (C. C. A. 3), says: "* * * Before the declarations of coconspirators can be received in evidence against one charged with participating in the conspiracy, it must be shown by independent evidence that the conspiracy existed and that the accused was a party to it at the time the declarations were made." Citing cases.

We refrain from discussing the assignments of error relative to the admission of certain testimony of conspirator Armstrong for the reason that the cases cited above are authority for the rejection of his testimony and further discussion would serve only to lengthen and incumber this opinion.

For error in admission of testimony of Mrs. Walkup, the judgment of the District Court is reversed and cause remanded.