UNITED STATES of America

v.

William TROTTER, Appellant in No. 75–1709, and Vincent Nuzzo.

Appeal of Vincent NUZZO, in No. 75–1710.

Nos. 75–1709, 75–1710.

United States Court of Appeals, Third Circuit.

Argued Nov. 17, 1975.

Decided Jan. 12, 1976.

Leonard Meyerson, Gerald D. Miller, Miller, Hochman, Meyerson & Miller, Jersey City, N. J., for William Trotter, appellant in No. 75–1709.

Morris Brown, Matthias D. Dileo, Wilentz, Goldman & Spritzer, Perth Amboy, N. J., for Vincent Nuzzo, appellant in No. 75–1710.

Jonathan L. Goldstein, U. S. Atty., James A. Plaisted, Asst. U. S. Atty., Newark, N. J., for appellee.

## OPINION OF THE COURT

Before VAN DUSEN, ADAMS and ROSENN, Circuit Judges.

ROSENN, Circuit Judge.

The theft of 422 cases of Excedrin from an interstate shipment by motor carrier is the genesis of the criminal prosecution which is the subject of this appeal. Defendants William Trotter and Vincent Nuzzo were tried to a jury in the United States District Court for the District of New Jersey and convicted on all three counts of an indictment charging (count I) conspiracy to steal and possess part of an interstate shipment of freight in violation of 18 U.S.C. § 371 (1971),[1] (count II) theft of freight from an interstate shipment in violation of 18 U.S.C. § 659 (1971),[2] and (count III) possession of goods stolen from an interstate shipment in violation of 18 U.S.C. § 659 (1971).

Nuzzo was sentenced to three years imprisonment and a fine of $2500 on each count to run concurrently. Trotter was sentenced to eighteen months imprisonment on each count to run concurrently. Both defendants appealed. We affirm.

## I.

During the last week in December 1973, two thousand cases of Excedrin were shipped from St. Louis, Missouri, to the carrier's terminal in Carteret, New Jersey, by truck trailer bearing double

---

1. 18 U.S.C. § 371 (1971) provides in relevant part:

 If two or more persons conspire . . . to commit any offense against the United States . . . and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

2. 18 U.S.C. § 659 (1971) provides in relevant part:

 Whoever . . . steals, or unlawfully takes, carries away, . . . or by fraud or deception obtains from any . . . motortruck . . . with intent to convert to his own use any goods or chattels moving as or which are a part of . . . an interstate or foreign shipment of freight or express; or

 Whoever buys or receives or has in his possession any such goods or chattels, knowing the same to have been embezzled or stolen;

 \* \* \* \* \* \*

 Shall in each case be fined not more than $5,000 or imprisoned not more than ten years, or both . . . .

seals, one of the manufacturer, Bristol-Meyers (Bristol) and the other of the carrier, Time D.C. (Time). The shipment arrived intact with seals in place. On December 31, 1973, Trotter, an employee of Time, drove the trailer of Excedrin from the Carteret terminal to Bristol's plant in Hillside, a distance of seventeen miles, leaving the terminal at 8:32 A.M. and arriving at his destination at 10:45 A.M. Although both seals were intact when the trailer left the terminal, upon arrival at Hillside the seals were gone and 422 cases of Excedrin were missing.

On the same morning, two or three pallets containing boxes of Excedrin appeared in an area of Gerald Fantel's air conditioning repair shop in Metuchen, New Jersey, fifteen miles from the Carteret terminal and twenty-five miles from Bristol's Hillside plant. Fantel, an unindicted co-conspirator in this case, periodically had allowed Nuzzo to use a storage area in his shop. He assumed Nuzzo was responsible for the presence of the Excedrin pallets even though they were placed near the loading dock rather than in Nuzzo's walled-in storage area. Therefore, Fantel later that day stopped by the restaurant which Nuzzo owned to ask him to move the pallets from the loading dock.

Fantel testified that Nuzzo responded to his request by claiming that Trotter owned the Excedrin and that Nuzzo was contemplating buying the goods. Fantel thereupon told Nuzzo to move the Excedrin out of his shop because the storage arrangement was with Nuzzo personally, not with Trotter.

On January 2, 1974, Fantel discovered the Excedrin still in the shop, and he renewed his request to Nuzzo to remove it from the building. Within a week, Nuzzo and Trotter, accompanied by a third person, loaded the Excedrin into a white unmarked van. Fantel aided in the loading.

Two days later, Nuzzo gave Fantel $200 in cash. According to Fantel's testimony Nuzzo stated that the money came from Trotter because Nuzzo had not bought the Excedrin. Nuzzo continued to store sundry goods in Fantel's shop for two or three months thereafter.

In March 1974 the Metuchen police raided Fantel's shop. When Fantel learned of the raid, he went to Nuzzo to ascertain what had happened. Fantel testified that Nuzzo assured him in the presence of Nuzzo's wife that nothing would happen and Nuzzo would pay half of Fantel's legal expenses. Fantel consulted an attorney and subsequently met with agents of the FBI to whom he gave information in return for a reduced charge of a misdemeanor.

On appeal, defendants primarily contend that the trial judge committed prejudicial error in: (1) denying Nuzzo's motion for acquittal; (2) admitting an extrajudicial hearsay statement by Nuzzo to be used against the defendant, Trotter; (3) admitting evidence of other crimes against the defendants; (4) failing to maintain a position of impartiality during the course of the trial.

## II.

First, we consider Nuzzo's contention that there is insufficient evidence to support any count of his conviction. At the close of the Government's case, Nuzzo moved for a judgment of acquittal for lack of evidence. The motion was denied, and the defense proceeded to introduce its evidence.[3] At the close of all the evidence, both defendants moved for judgments of acquittal, pursuant to Fed.R.Crim.P. 29(a). The motions were denied.

The Government does not contend that there is evidence that Nuzzo himself stole the Excedrin. Rather, it relies on *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), to

---

**3.** By introducing evidence, Nuzzo waived his motion for acquittal. Since he renewed his motion at the end of all the evidence, we must examine the record as a whole for sufficient evidence to sustain a conviction. *United States v. Feldman*, 425 F.2d 688, 692 (3d Cir. 1970); *United States v. Coblentz*, 453 F.2d 503, 506 (2d Cir. 1972).

support Nuzzo's conviction on the substantive theft count. In *Pinkerton,* the Court affirmed a conviction for substantive offenses solely on evidence that the defendant had participated in a conspiracy and that his co-conspirator had committed the offenses in furtherance of the conspiracy. The Court stated:

The unlawful agreement contemplated precisely what was done. It was formed for the purpose. The act done was in execution of the enterprise.

*Id.* at 647, 66 S.Ct. at 1184. *Accord, United States v. Boyance,* 329 F.2d 372, 375 (3d Cir.), *cert. denied sub nom. Feldman v. United States,* 377 U.S. 965, 84 S.Ct. 1645, 12 L.Ed.2d 736 (1964).

■ A defendant may be convicted of a substantive offense which he did not himself commit if it is clear that the offense was committed in furtherance of a conspiracy of which the defendant was a member. *United States v. Miley,* 513 F.2d 1191, 1208 (2d Cir. 1975). Thus, if there is sufficient evidence that Nuzzo conspired with Trotter before the commission of the theft and that theft was an object of the conspiracy, Nuzzo was properly convicted of theft under the *Pinkerton* rule.

■ Since the jury returned a guilty verdict, we must examine the evidence in the light most favorable to the Government, giving it the benefit of the inferences to be drawn therefrom. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. De Cavalcante,* 440 F.2d 1264, 1273 (3d Cir. 1971). We are persuaded after examining the record that the jury reasonably could have inferred that Nuzzo and Trotter entered into a conspiracy prior to the theft and that the theft was committed in furtherance of their conspiracy.[4]

■ Fantel testified that he and Nuzzo in early 1973 entered into an arrangement whereby Nuzzo could store goods in Fantel's shop. Nuzzo made himself a key to the shop and stored sundry goods there from the latter part of 1973 through the first quarter of 1974. Fantel saw Nuzzo in the shop at times when shipments of goods arrived by tractor-trailer, which Nuzzo would remove by use of a fork lift. The goods would remain in the shop for periods of time ranging from a few hours to a few days until removed by Nuzzo by truck.

Nuzzo and Fantel did not enter into a conventional lease nor did they arrange for regular monthly rental payments. Rather, Nuzzo paid Fantel at irregular intervals in cash in sums of fifty or a hundred dollars. From this evidence emerges the outline of an informal relationship between the two men prior to December 1973 from which a jury reasonably could have inferred an arrangement for the storage of stolen goods which were periodically dropped off at Fantel's shop.

There is also evidence that Nuzzo and Trotter conspired to capitalize on Nuzzo's convenient storage arrangement. Trotter visited Nuzzo's luncheonette during 1972 and 1973, and Fantel observed Trotter with Nuzzo in the shop on at least one other occasion unloading merchandise from a truck.

■ The Government argues convincingly that for Trotter to be able to drive the 15 miles from Time's terminal to Fantel's shop, unload 422 cases of Excedrin, and then drive 25 miles from the shop to Bristol's Hillside plant within only two and a quarter hours, of necessity, required a previously arranged drop-off point for the Excedrin. Trotter would have had to know of the existence of the storage space and be assured of its availability before he embarked on the theft. The planning and execution of the theft, the ultimate disposition of

---

4. A conspiracy can be proved by indirect and circumstantial evidence. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). "A common purpose and plan may be inferred from a 'development and collocation of circumstances.'" *Id. Accord, United States v. Klein,* 515 F.2d 751, 754 (3d Cir. 1975); *United States v. Barrow,* 363 F.2d 62, 64 (3d Cir. 1966), *cert. denied* 385 U.S. 1001, 87 S.Ct. 703, 17 L.Ed.2d 541 (1967).

the idiosyncratic goods, and especially the concealed interim storage, "was not the crime of an impulse or a moment." [5] That the Excedrin was hurriedly left on the loading dock blocking the overhead door rather than being moved to Nuzzo's storage area underscores the time pressure under which Trotter was operating. The jury could have inferred from the foregoing evidence that a conspiracy to steal and store goods existed between Trotter and Nuzzo before Trotter effected the theft of the Excedrin.

■ Nuzzo also attacks his conviction on the possession count, contending that there is no evidence to establish even constructive possession. However, we believe that there was such a "nexus" between Nuzzo and the Excedrin that we reasonably may treat the extent of his control over it as if it were actual possession. *United States v. Carneglia*, 468 F.2d 1084, 1087 (2d Cir. 1972), *cert. denied*, 410 U.S. 945, 93 S.Ct. 1391, 35 L.Ed.2d 611 (1973). Nuzzo apparently opened up the shop to Trotter and took responsibility for the presence of the goods, although disclaiming ownership when speaking to Fantel. He had the goods moved in response to Fantel's request, and he loaded the goods into a van jointly with Trotter and others.

Since we find the jury's verdict to be supported by sufficient evidence, we hold that the judge properly denied Nuzzo's motion for acquittal.

### III.

Defendant Trotter objects to the following testimony by Gerald Fantel and contends that it is inadmissible hearsay:

Mr. Nuzzo stated that the Excedrin belonged to Mr. Trotter and Mr. Nuzzo was thinking of buying the Excedrin. He also said that the Excedrin may be—used the terminology—hot; at which point I said, number one, "I don't like dealing with Bill Trotter."

■ Out-of-court statements by a co-conspirator may be admissible "against other defendants upon a sufficient showing, by independent evidence, of a conspiracy among one or more other defendants and the declarant" if the statements were in furtherance of the conspiracy. *United States v. Nixon*, 418 U.S. 683, 701, 94 S.Ct. 3090, 3104, 41 L.Ed.2d 1039 (1974) (footnote omitted). Trotter contends that the district court applied the wrong standard in measuring the amount of independent evidence necessary to establish the existence of a conspiracy. He further claims that Nuzzo's statements to Fantel were not in furtherance of a conspiracy but rather had the effect of frustrating it.

The district court required that the existence of a conspiracy be proved by "a fair preponderance of [independent] evidence," a standard derived from *United States v. Bey*, 437 F.2d 188, 191 (3d Cir. 1971), before the out-of-court statement of co-conspirator Fantel could be admitted against Trotter. This court in *Bey* borrowed the "fair preponderance of the evidence" test from *United States v. Geaney*, 417 F.2d 1116, 1120 (2d Cir. 1969), *cert. denied, Lynch v. United States*, 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970). Trotter in his brief in this court urges that we discard that test in favor of "proof beyond a reasonable doubt." At the very least, he would have us apply the test set forth in *United States v. Nixon, supra,* 418 U.S. at 701 n. 14, 94 S.Ct. at 3104:

As a preliminary matter, there must be substantial, independent evidence of the conspiracy, at least enough to take the question to the jury.

In support of this standard, the Supreme Court cited six cases from United States Courts of Appeals for five circuits.[6] Each

---

5. *See* comment of trial judge at sentencing, *infra* at 815.

6. *United States v. Vaught*, 485 F.2d 320 (4th Cir. 1973); *United States v. Hoffa*, 349 F.2d 20 (6th Cir. 1965), *aff'd on other grounds*, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966); *United States v. Santos*, 385 F.2d 43 (7th Cir.

1967), *cert. denied*, 390 U.S. 954, 88 S.Ct. 1048, 19 L.Ed.2d 1148 (1968); *United States v. Morton*, 483 F.2d 573 (8th Cir. 1973); *United States v. Spanos*, 462 F.2d 1012 (9th Cir. 1972); *Carbo v. United States*, 314 F.2d 718 (9th Cir. 1963), *cert. denied*, 377 U.S. 953, 84 S.Ct. 1625, 12 L.Ed.2d 498 (1964).

of those six cases, however, speaks in terms of a "prima facie proof" of a conspiracy, rather than a preponderance of the evidence. The list of cases does not include any from this circuit or from the Second Circuit, both of which have adopted the requirement of a preponderance of the evidence. This omission may indicate the Court's intention to overrule *sub silentio* the preponderance of evidence test which obtains in both circuits.

The Second Circuit was recently urged, as we are here, to adopt the standard adverted to in the foregoing footnote in *United States v. Nixon. United States v. Wiley,* 519 F.2d 1348, 1350–51 (2d Cir. 1975). It refused to overrule the "fair preponderance of the evidence" standard of *Geaney* and it labeled the *Nixon* footnote "pure dictum." *Id.* The court noted that, subsequent to the *Nixon* decision, the Supreme Court denied certiorari in several Second Circuit cases in which the "fair preponderance of evidence" test was applied.[7]

■ We need not determine whether the standard referred to in *United States v. Nixon, supra,* has more to commend it than the "fair preponderance" standard applied in this circuit. Since the "fair preponderance" standard is more severe than the prima facie standard, admission of hearsay under the former would *a fortiori* satisfy the latter.[8] In the instant case, the application of the fair preponderance standard placed a greater burden on the prosecution than it would have borne under the prima facie standard alternatively urged by defendant Trotter.[9] The district court correctly determined that there was a fair preponderance of independent evidence establishing the existence of a conspiracy between Trotter and Nuzzo.

Trotter argues that the only evidence independent of the hearsay which directly links him to Nuzzo is Fantel's testimony about Nuzzo and Trotter loading Excedrin into the van. As this act occurred after the hearsay statement, Trotter argues that it cannot be used to establish that a conspiracy existed at the time of the statement.[10] We do not agree.

■ Evidence of acts following a conspiracy can be admitted to elucidate the nature of the prior conspiracy. *Anderson v. United States,* 417 U.S. 211, 219, 94 S.Ct. 2253, 41 L.Ed.2d 20 (1974); *Lutwak v. United States,* 344 U.S. 604, 617, 73 S.Ct. 481, 97 L.Ed. 593 (1953). Evidence that Trotter and Nuzzo were jointly loading boxes of Excedrin, which reasonably could be inferred to be the

---

7. *United States v. Cirillo,* 499 F.2d 872 (2d Cir. 1974), *cert. denied,* 419 U.S. 1056, 95 S.Ct. 638, 42 L.Ed.2d 653 (1974); *United States v. D'Amato,* 493 F.2d 359 (2d Cir.), *cert. denied,* 419 U.S. 826, 95 S.Ct. 43, 42 L.Ed.2d 50 (1974); *United States v. Santana,* 503 F.2d 710 (2d Cir.), *cert. denied,* 419 U.S. 1053, 95 S.Ct. 632, 42 L.Ed.2d 649 (1974).

8. The requirement of prima facie proof is less stringent than that of a preponderance of the evidence. The former requires only enough evidence to take the question to the jury whereas the latter requires "proof which leads the jury to find that the existence of the contested fact is more probable than its nonexistence." McCormick, *Evidence* 794 (2d ed. 1972).

9. The Government, in its brief to this court, agrees that the prima facie standard "is a far lighter burden" than the fair preponderance of the evidence standard and requests that this Circuit adopt that test. We are constrained to adhere to the standard previously enunciated by this court in *Bey.*

10. Trotter cites *Mayola v. United States,* 71 F.2d 65, 67 (9th Cir. 1934), and *Nibbelink v. United States,* 66 F.2d 178, 179 (6th Cir. 1933), for the proposition that acts performed subsequent to a statement by an alleged co-conspirator cannot be used as independent proof that a conspiracy existed at the time of the statement. Neither case is authority for that position. In *Mayola,* the out-of-court statements were inadmissible because they were merely narratives of past events and were not in furtherance of the conspiracy. 71 F.2d at 67. The court in *Nibbelink* determined that the hearsay was inadmissible because, even considering the subsequent acts, there was insufficient independent evidence from which to infer a conspiracy. 66 F.2d at 179. This interpretation is given to *Nibbelink* in *Williams v. United States,* 289 F.2d 598, 602 (9th Cir. 1961), and *Anthony v. United States,* 256 F.2d 50, 55 (9th Cir. 1958).

subject of the earlier out-of-court statement, sheds some light on the collaboration between Trotter and Nuzzo on December 31, 1973. The subsequent handling of the Excedrin by both defendants is particularly illuminating; it completes the mosaic introduced by the Government which inferentially establishes Trotter as the direct source of the goods and Nuzzo as the active provider for their storage.

Trotter also argues that the hearsay statement was not uttered by Nuzzo in furtherance of the conspiracy and so does not fit within the co-conspirator exception to the hearsay rule. Many courts, it may be noted, have given a broad construction to the requirement that a statement be "in furtherance" of the conspiracy.[11]

If Nuzzo had merely informed Fantel that the goods belonged to Trotter, his statement might have indicated his dissociation from a conspiracy and an attempt to exculpate himself at Trotter's expense. Nuzzo, however, identified his own interest in the goods, arguably in an effort to persuade Fantel to allow the Excedrin to remain in the shop for a while. Thus, the statement can be construed as an attempt to secure the storage space for the Excedrin in furtherance of the conspiracy.

We conclude that Nuzzo's out-of-court statement to Fantel concerning Trotter was properly admitted under the co-conspirator exception to the hearsay rule.

11. Emphasis appears to be placed instead upon the requirement that the conspiracy be in progress at the time of the hearsay statement. *Anderson v. United States*, 417 U.S. 211, 218, 94 S.Ct. 2253, 41 L.Ed.2d 20 (1974); *United States v. Armocida*, 515 F.2d 29, 47 n.25 (3d Cir. 1975). *See also United States v. Overshon*, 494 F.2d 894, 899 (8th Cir. 1974); *United States v. Annunziato*, 293 F.2d 373, 380 (2d Cir. 1961), *cert. denied*, 368 U.S. 919, 82 S.Ct. 240, 7 L.Ed.2d 134 (1961); McCormick, *Evidence* 645–46 (2d ed. 1972).

12. Relevant portions of the testimony in question follow:

Q: [Assistant U. S. Attorney] How frequently did he use the warehouse or shop?

## IV.

Both defendants object to the Government's introduction of other possible criminal activities of Nuzzo through Fantel's testimony.[12] Evidence of other crimes is admissible in the sound discretion of the trial court if its probative value in relation to an issue other than propensity to commit crimes outweighs its prejudicial effect. *United States v. Klein, supra*, 515 F.2d at 755–56; *United States v. Chrzanowski*, 502 F.2d 573, 575 (3d Cir. 1974).

In this case, the reference to the movement of sundry goods in and out of Fantel's shop was only inferentially related to other criminal activity by Nuzzo. Its prejudicial impact was minimal. On the other hand, its probative value in establishing the nature of Nuzzo's arrangements with Fantel and of his use of the storage area is substantial. Thus, the testimony was properly admitted.

Nuzzo and Trotter further object to the following testimony by Fantel concerning a conversation he had with Nuzzo after his shop had been raided by the Metuchen police:

A: I went to Mr. Nuzzo and his wife was present. I was a little upset. I said, "What happened? You know, what's going on?"

Basically it came down to this. He said, "Don't worry about it. Nothing is going to happen. I'll pay half your legal expenses. You'll probably get a suspended sentence. You've never been involved with the

A: [Fantel] . . . I know at least four to eight times.

\* \* \* \* \* \*

Q: Without specifically referring to what merchandise was stored in your shop, can you tell us whether it was the same merchandise that went into the shop and remained the same type of merchandise throughout the period of time he was storing it in there?

A: No.

\* \* \* \* \* \*

Q: [D]id he continue to store goods in your shop after that Excedrin had left your warehouse?

A: Yes.

police before." Basically platitudes of this nature.

Before Fantel was allowed to testify as to this conversation, the court gave the jury a limiting instruction which confined their consideration of the testimony to the question of Nuzzo's guilt and prohibited their considering the testimony in relation to Trotter.

 The defendants also characterize this testimony as other crimes evidence. The Government contends it is simply evidence of a guilty mind as regards goods stored with Fantel, including the Excedrin. As Nuzzo's knowledge and intent were at issue in the trial, his conversation with Fantel may be admitted as relevant to that issue.[13] 2 Wigmore, *Evidence* § 266 (3d ed. 1940); *United States v. Miles*, 468 F.2d 482, 489–90 (3d Cir. 1972); *United States v. Martin*, 489 F.2d 674, 676 (9th Cir. 1973).

### V.

 Finally, we reach the argument advanced by both defendants that the district court judge interfered in the trial on the side of the Government and that he improperly imposed disparate sentences. We have carefully examined the record and find no substantiation for these charges. The function of a federal judge includes intervention in order to clarify issues, insure the orderly presentation of evidence and expedite the trial. *United States v. Budzanoski*, 462 F.2d 443, 455 (3d Cir. 1972), *cert. denied*, 409 U.S. 949, 93 S.Ct. 271, 34 L.Ed.2d 220 (1972); *Cromling v. Pittsburgh & Lake Erie R.R. Co.*, 327 F.2d 142, 151–52 (3d Cir. 1963). The district court judge did no more than discharge his proper role evenhandedly and fairly.

An objection tangentially related to the charge of partiality is Nuzzo's contention that his counsel was improperly restrained in his cross-examination of Fantel. The court denied him permission to paraphrase the text of an FBI interview with Fantel because it considered counsel's version to be an inaccurate statement of the interview.

 We have reviewed the transcript of the interview, which was read into the record, and agree that Nuzzo's counsel was attempting to use an inaccurate paraphrase. Furthermore, it is well settled that it lies within the sound discretion of the court to limit cross-examination. *United States v. Greenberg*, 419 F.2d 808, 809 (3d Cir. 1969); *United States v. Casavina*, 368 F.2d 987, 988 (3d Cir. 1966), *cert. denied*, 385 U.S. 1006, 87 S.Ct. 711, 17 L.Ed.2d 544 (1967). We cannot say that the trial court abused its discretion by confining the cross-examination of Fantel by Nuzzo's counsel to the verbatim contents of Fantel's statement.

 Nuzzo in this court attacks the disparity of sentences imposed on the two defendants. Nuzzo was fined; Trotter was not. Trotter was sentenced to eighteen months' imprisonment on each count to run concurrently; Nuzzo's sentence was twice as long. The district

---

**13.** Reference to other crimes was made later in Fantel's redirect examination. On cross-examination, counsel for Trotter mentioned the raid on Fantel's shop by the Metuchen police as follows:

> You were arrested with respect to that raid—with respect to another criminal involvement, right? Nothing to do with this particular case; is that right?

Thereupon, on redirect examination, the Government asked whether this activity also involved Nuzzo. Fantel responded that it did. Although counsel for Nuzzo objected to the question, both counsel and the court were apparently under the impression that Fantel had not answered. The court instructed the jury that Fantel would not be permitted to respond and that they should disregard the question. We believe that this all but inaudible reference to Nuzzo's other crimes is "of a brief and passing nature" and, at its worst, is harmless error. *United States v. Gocke*, 507 F.2d 820, 823 (8th Cir. 1974), *cert. denied*, 420 U.S. 979, 95 S.Ct. 1407, 43 L.Ed.2d 660 (1975). *See also United States v. Windham*, 489 F.2d 1389, 1391 (5th Cir. 1974); *United States v. Alston*, 157 U.S.App.D.C. 261, 483 F.2d 1264, 1266 (1973); *United States v. Barcenas*, 498 F.2d 1110, 1113 (5th Cir. 1974).

court judge, at sentencing, said to Nuzzo:

> In the particular transaction on which you stand convicted you in concert with a truckdriver made the arrangement for the theft of $25,000 worth of Excedrin . . .. [T]o arrange for the theft, the warehousing and the ultimate disposition of that amount of goods, to that amount of value, was not the crime of an impulse or a moment.

Apparently, the judge viewed Nuzzo as the mastermind of the operation for which he and Trotter were convicted. He believed that Nuzzo's dominant role warranted a heavier sentence. We fail to see any abuse of discretion in the district court's disparate sentence.

■ Nuzzo raises one last objection which warrants brief discussion. He contends that the Government's comment in summation on his conversation with Fantel in the presence of Nuzzo's wife constitutes an impermissible burden on his exercise of the spousal privilege.[14] The remarks Nuzzo finds objectionable are as follows:

> [Fantel] didn't say we had a quiet conversation and nobody could hear us. "I had a conversation in front of his wife."
>
> Now who would you expect to testify against you? Who is the last person you want present there to testify against what you say? You'd expect a man's wife to be with him. You'd expect a man's wife to eliminate everything you say. But Fantel tells you his wife is there. He admits it.

■ Nuzzo argues that this commentary contains an inference that Mrs. Nuzzo's testimony would have been unfavorable if she had testified. Taking the remarks in context, it is evident that the Government in no way burdened Nuzzo's spousal privilege. Not only did the Government make no mention of

Mrs. Nuzzo's failure to testify, its summation carried the strong implication that her testimony would be expected to *favor* Nuzzo. By mentioning Mrs. Nuzzo's presence at his conversation with Nuzzo, Fantel was identifying a potentially damaging witness, according to the Government's argument, which shows that Fantel must be telling the truth. We find no prejudice to Nuzzo in the Government's summation.

We have examined the defendants' objections and hold that they do not warrant reversal of the convictions. The convictions of both defendants on all three counts will be affirmed.

---

**14.** The spousal privilege belongs both to the party-spouse who may prevent his spouse from testifying, and to the non-party-spouse, who may sua sponte refuse to testify. *Wyatt v. United States*, 362 U.S. 525, 80 S.Ct. 901, 4 L.Ed.2d 931 (1960).