UNITED STATES of America

v.

Theodore GELLER et al.

Cr. No. 82–224.

United States District Court,
E.D. Pennsylvania.

Aug. 9, 1983.

See also D.C., 560 F.Supp. 1309.

Elizabeth Ainslie, Asst. U.S. Atty., Philadelphia, Pa., for plaintiff.

Daniel Huyett, Reading, Pa., for defendant Josephine DeMaise.

Jeffrey Miller, Philadelphia, Pa., for defendant Louis DeMaise.

Theodore Simon, Philadelphia, Pa., for defendant John Newell.

Richard Atkins, Philadelphia, Pa., for defendant Andrew Samuels.

## MEMORANDUM AND ORDER

TROUTMAN, District Judge.

Defendants Louis and Josephine DeMaise, moving for a new trial and/or judgment of acquittal, assert generally that their convictions are not supported by record evidence, that antagonistic defenses between themselves and co-defendants deprived them of a truly fair trial, that statements made by co-conspirators were improperly admitted against them and that we erred in denying their motions for judgment of acquittal at the close of the government's case. We will deny these motions for the reasons set forth below. We will also deny defendant Newell's motion to dismiss the indictment because of the purport-

ed under-representation of women from the office of grand jury foreperson.[1]

■ Whether the DeMaises are entitled to a judgment of acquittal pursuant to Fed. R.Crim.P. 29(c) requires reference to the evidence adduced at trial and consideration of whether all the inferences drawn therefrom, when viewed in the light most favorable to the government, support the finding of guilt beyond a reasonable doubt. *Burks v. United States,* 437 U.S. 1, 16, 98 S.Ct. 2141, 2149, 57 L.Ed.2d 1 (1978); *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), *United States v. Joseph,* 526 F.Supp. 504, 506 (E.D.Pa.1981). *Cf., United States v. Dixon,* 658 F.2d 181, 188 (3d Cir.1981). (This same standard, deferential to the verdict winner, is employed by appellate courts when reviewing the decision to grant a defendant's Rule 29(c) motion).

■ Motions for a new trial, pursuant to Fed.R.Crim.P. 33, are, on the other hand, broadly committed to our "sound discretion". *United States v. Barlow,* 693 F.2d 954, 966 (6th Cir.1982); *United States v. Friedland,* 660 F.2d 919, 931 (3d Cir.1981), *cert. denied,* 456 U.S. 989, 102 S.Ct. 2268, 73 L.Ed.2d 1283 (1982); *United States v. Iannelli,* 528 F.2d 1290, 1292 (3d Cir.1976). This rule is "especially" true where, as here, the court sat as the factfinder. *United States v. Jacobson,* 236 F.Supp. 577, 578 (E.D.Pa.1964).

■ A review of the record as to Josephine DeMaise demonstrates she was charged in Count I of a fifty-eight count indictment. In that count, it was charged that Josephine DeMaise conspired, along with thirteen others, to distribute heroin in violation of Title 21 U.S.C. § 846. The Court found Josephine DeMaise guilty of the charged offense after a bench trial which ended in early June of this year.

The evidence adduced against Josephine DeMaise reveals that defendant Anthony DeAngelis was receiving packages of heroin in the mail from defendant Avrim Weiner.

DeAngelis conspired to distribute this heroin through his co-defendants, one of which was Josephine DeMaise. Her involvement in the scheme generally revolved around making appointments for her husband, Louis, who purchased heroin from DeAngelis.

Specifically, the evidence adduced by the government proves that on October 14, 1981, Josephine DeMaise called DeAngelis and was advised in a coded, but understood way, that heroin had just arrived at the DeAngelis household. At that time, she made an appointment for her husband to purchase the drug. (Tape 7, Log 19).

Three days later, on Saturday, October 17, 1981, Josephine DeMaise again called DeAngelis. Inquiring in a knowing manner and on behalf of her husband, she asked whether anything was "happening", *i.e.,* whether an additional package of heroin had arrived. DeAngelis responded in the negative but suggested that she call back on Monday. (Tape 10, Log 17). Josephine DeMaise complied with this instruction and called back on Monday, October 19, 1981. (Tape 12, Log 10). DeAngelis was not at home; Josephine spoke with DeAngelis' girlfriend, defendant Linda Peck. Josephine then stated that she would call DeAngelis back in half an hour. Half an hour later she called back and again spoke with Peck. (Tape 12, Log 13). Thereafter, Louis DeMaise spoke with DeAngelis who advised that the anticipated heroin-laden package should arrive at four-thirty.

These conversations prove that Josephine DeMaise acted as a knowing and willing participant in the distribution scheme as alleged in the indictment. Most critically, they demonstrate that she had foreknowledge and could anticipate when heroin shipments would arrive from defendant Weiner. Accordingly, we conclude that her motion for judgment of acquittal is properly denied.

Louis DeMaise's involvement in Count I parallels Josephine's. Indeed, much of Jo-

---

1. Newell's motion was originally filed as a pretrial matter. He agreed not to press it at that time. We, accordingly, held the motion under advisement pending the outcome of trial.

sephine's activities with regard to the conspiracy were in aid of Louis' conspiratorial conduct. However, Louis DeMaise's involvement is broader than that of his wife. For example, the evidence establishes that on October 23, 1981, DeAngelis was suffering from a dwindling heroin supply. (Tape 16, Log 10). On that same day, Louis DeMaise spoke with DeAngelis. Louis DeMaise asked DeAngelis whether he was "still happening", *i.e.,* whether DeAngelis had any heroin to distribute. DeAngelis responded that he was out of heroin and that he, DeAngelis, had called Louis DeMaise "to find out how long it is going to be". (Tape 16, Log 18). During this conversation, which also forms the basis of Count 44 [2], Louis DeMaise told DeAngelis that he, DeMaise, would be able to meet with DeAngelis on the following Monday, October 26, 1981. During the interim, October 24–25, DeAngelis was virtually out of heroin. (Tape 18, Log 3).

The next Monday, October 26, 1981, DeAngelis and Louis DeMaise met at the DeMaise household; Louis DeMaise conveyed heroin to DeAngelis at that time.[3]

The evidence also demonstrates that the DeMaises had planned to make the trip from their Cinnaminson, New Jersey, home to the DeAngelis residence in Boyertown, Pennsylvania, on October 26, 1981. While enroute, however, they experienced car trouble. DeAngelis met them at a gas station and drove them back to their house. The evidence established that after DeAngelis met with Louis DeMaise, he, DeAngelis, once again had heroin for sale.

At trial, the government contended that Louis DeMaise conveyed heroin to DeAngelis on October 26. The transaction occurred while the two men were at the DeMaise household. The government's proofs were largely circumstantial. Specifically, the government argued that DeAngelis had a dwindling heroin supply during the relevant time and sought to obtain heroin from

Louis DeMaise. After the pre-arranged meeting between the two men, DeAngelis had heroin for sale. Hence, the prosecution argued that Louis DeMaise sold the drug to DeAngelis.

Defendants, of course, draw contrary inferences from this same evidence. They argued that the DeMaise and DeAngelis families had been long-standing social friends. They also contended that DeAngelis had inherited a gold coin collection and that the subject of all transactions between him and Louis DeMaise, an avid collector of gold coins, was gold coins. Louis DeMaise also pointed to uncontradicted evidence that the original meeting scheduled for October 26, 1981, between himself and DeAngelis was to be at the DeAngelis residence. If the purpose of the meeting was, as argued by the government, to replenish DeAngelis' heroin supply, questions DeMaise, why did DeAngelis balk at driving to New Jersey to meet with Louis DeMaise? (Tape 19, Log 14). Presumably, DeAngelis would have been anxious to drive to New Jersey to procure the heroin. Moreover, if DeAngelis was out of heroin at that time and generally sold it on a regular basis, why did he state that he desired to stay home and "make some money" on the relevant date? (Tape 19, Log 14.)

We do not find these arguments persuasive in light of the overwhelming number of tapes which showed that DeAngelis was low on drugs at the relevant time. Additionally, DeAngelis always made telephone arrangements prior to procuring heroin. The only one he spoke to in that regard was Louis DeMaise.

Finally, the DeMaises argued that if DeAngelis procured heroin on that evening, he purchased it from someone else. Specifically, defendants contend that DeAngelis had sources of heroin in Bucks County, Pennsylvania, and that he stopped there while driving from the DeMaise house in

---

2. Count 44 generally charged Louis DeMaise with knowingly using a telephone to conspire to distribute heroin. *See,* 21 U.S.C. § 843(b).

3. This transaction forms the basis of Count 46 wherein the grand jury charged Louis DeMaise with distributing heroin to DeAngelis in violation of 21 U.S.C. § 841(a)(1).

New Jersey to his own home in Boyertown, Pennsylvania.

This contention is based upon two conversations. (Tape 19–2, Log 40; Tape 20, Log 1). In the first, DeAngelis called his home and spoke to Peck. He reported that he just arrived at the DeMaise household, was going to get a drink and would leave shortly thereafter. In the second tape, DeAngelis calls Louis DeMaise from his, DeAngelis' home, and reports that he "just got home" and that the ride took one hour and fifteen minutes.

Viewing these two tapes, we have DeAngelis saying to Peck that he will leave immediately and, in the second tape, DeAngelis telling DeMaise that the ride took an hour and fifteen minutes and that he just got home. If DeAngelis did indeed leave immediately and if he actually called DeMaise immediately upon his arrival, the evidence demonstrates that the ride took an hour and forty-five minutes; hence, thirty minutes of his time is apparently unaccounted for. DeMaise points to DeAngelis' heroin sources in Bucks County and to this thirty minute gap of unaccounted for time and argues that DeAngelis actually procured the heroin that evening from someone other than himself. In support of his contention, DeMaise also points to the fact that Weiner generally sold DeAngelis heroin and that DeMaise was a customer of DeAngelis. He contends that a customer such as DeMaise could not become, as a practical matter, a supplier.

However, we think the tapes demonstrate that Louis DeMaise had sufficient contacts to periodically supply DeAngelis with heroin. *See e.g.,* (Tape 16, Log 18). The so-called thirty-minute gap also overlooks a number of realistic considerations. The first is the DeAngelis call to Peck, (Tape 19, Log 40), where he stated that he will leave immediately after having a drink. Presumably, it took him some time to have a drink. Moreover, Robert DeMaise, brother of defendant Louis, testified that Louis and DeAngelis "spoke about coins" that evening. Therefore, although DeAngelis indicated to Peck that he would leave immedi-

ately, he did not. The thirty-minute gap is further eroded by the fact that it assumes that when DeAngelis called DeMaise and reported that he had gotten home safely, (Tape 20, Log 1) that he called immediately upon his return. In all likelihood, he may have taken a minute or two to take off his jacket, use the bathroom, or just relax for a few minutes. Therefore, the thirty-minute gap is further reduced.

Additionally, all of DeAngelis' transactions were preceded by telephone calls. If DeAngelis had prearranged a buy from an alternative source in Bucks County it would likely have appeared on the wiretap. If, on the other hand, he was unable to arrange a buy in Bucks County until he got to the DeMaise household that, of course, would not appear on the wiretap. However, on the wiretap, DeAngelis is heard saying that he is waiting to "hook up tonight". (Tape 19, Log 17). The only person he was then planning to meet that night was Louis DeMaise. He could not have been planning at that time to meet an alternative source which he had not yet contacted.

We accordingly conclude that the convictions of Louis and Josephine DeMaise are properly supported by the evidence.

■ In seeking a new trial the DeMaises generally assert that they were prejudiced by the "inherently antagonistic" defense presented by co-defendants Andrew Samuels and John Newell. This assertion is apparently premised upon the notion that we erred in denying pre-trial motions to sever. We disagree.

The defense strategy of Samuels and Newell was not antagonistic to that of the DeMaises. Generally, all parties at trial agreed that DeAngelis was a heroin distributor. The DeMaises argued that their contacts with DeAngelis were legitimate ones and were based upon long-standing familial friendships and a common interest in gold coins. Newell and Samuels, on the other hand, admitted that they purchased or procured heroin from DeAngelis but claimed that the drug was for their personal use only. Hence, they argued that they could not be convicted of distribution. In light of

the purity of heroin purchased by each of these defendants, and Samuels' activity as a conduit of money from defendant Friedman to DeAngelis, we disagreed and found them guilty. This brief and perhaps simplified, but nevertheless accurate, description of the defenses presented at trial does not admit to any antagonism.

Moreover, although defendants now claim that we should have granted their motions to sever, defendants have not made any "showing" of prejudice. *United States v. Dickens,* 695 F.2d 765, 779 (3d Cir.1982). Indeed, it is difficult to imagine that any such showing could be made in light of the fact that the Court sat as trier of fact; the Court is capable of sorting out conflicting defense strategies. Thus, the DeMaises' unsubstantiated claims of prejudice have little merit.

■ The DeMaises also complain that we improperly permitted co-conspirator statements to be used against them and that we never specifically "found" that there was sufficient independent evidence to connect them with the conspiracy.

Courts need not, however, make any explicit "finding" that a conspiracy exists and that the defendant was a participant therein. In fact, when a court denies a defendant's Rule 29 motion at trial, it *sub silentio* determines that a fair preponderance of the independent evidence shows that defendant is a conspirator. *United States v. Ammar,* 714 F.2d 238 at 247 No. 81–1745 slip op. at 11 (3d Cir. June 30, 1983), quoting, *United States v. Trotter,* 529 F.2d 806, 811 (3d Cir.1976).[4]

The government's evidence *aliunde* of a conspiracy "need not be overwhelming". *United States v. Ammar, supra,* at 250. Indeed, the government carries its burden so long as the proof *aliunde* supports a finding that the "existence of the contested fact is more probable than its non-existence". *United States v. Trotter,* 529 F.2d

at 812. Here again, the government's evidence must be considered in the light most favorable to the government. *United States v. Provenzano,* 620 F.2d 985, 999 (3d Cir.1980).

The evidence adduced at trial showed that both Josephine and Louis DeMaise knew of and participated in a conspiracy to distribute heroin. Both demonstrated knowledge that DeAngelis procured the drug from a distant source and that illicit packages arrived on a semi-regular basis at the DeAngelis household. Not surprisingly, the DeMaises worked as a team; each one facilitating the activities of the other. We conclude that the independent evidence, tested under the standards announced in *United States v. Ammar, supra,* sufficiently proves a conspiracy between the DeMaises and others. Hence, it was not error to introduce co-conspiratorial statements.

■ The final argument made by the DeMaises is that we erred in denying their Rule 29 motion. We understand this as resurrecting the arguments made on behalf of the DeMaises at trial. The most cogent argument made by the DeMaises at that time was that the government had shown multiple, rather than a single, conspiracy. This is impermissible. *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); *United States v. Camiel,* 689 F.2d 31 (3d Cir.1982). We have reviewed the government's evidence as to a single conspiracy under the standards of *United States v. DiPasquale,* 561 F.Supp. 1338, 1348–52 (E.D.Pa.1983) (Ditter, J.), and find that a single, unitary conspiracy was proven. We accordingly deny the DeMaises' post-trial motions.

■ We now turn briefly to defendant Newell's motion to dismiss the indictment because of alleged improprieties in selecting grand jury forepersons. Newell's specific contention is that females have been sys-

---

4. In any case we determined by order of May 6, 1983, that the government's pre-trial offer of proof satisfies the "preponderance of the evidence" test articulated in *United States v. Trowery,* 542 F.2d 623, 626–27 (3d Cir.1976)

(*per curiam*), *cert. denied,* 429 U.S. 1104, 97 S.Ct. 1132, 51 L.Ed.2d 555 (1977). Trial developments convince us that this ruling was correct.

tematically under-represented in the position of grand jury foreperson.[5]

Newell's motion to dismiss is supported by the affidavit of Dr. John Lamberth, an associate professor of psychology at Temple University. He swears that women are under-represented as grand jury forepersons in a statistically significant fashion. For example, his calculations reveal that during the relevant time 13.5% of all grand jury forepersons appointed in the Eastern District of Pennsylvania were women. This amounts to an absolute disparity of 40.1% from the percentage of women within the District, and a relative disparity of 74.8%. The probability of these numbers naturally occurring is assertedly less than 1 in 10,000.

Moreover, Dr. Lamberth attests that he has studied small group decisionmaking since 1972. His particular emphasis has been upon jury decisionmaking and he has studied the decisionmaking process in over 100 mock *petit jury* deliberations. Finally, Dr. Lamberth states that, within the context of his research, the foreperson is the most influential individual in jury deliberations.

This analysis is interesting but not legally compelling. We are not convinced, as a matter of law, that the office of grand jury foreperson is of constitutional significance. *United States v. Musto,* 540 F.Supp. 346, 361 (D.N.J.1982). Moreover, the Jury Selection and Service Act of 1968, 28 U.S.C. § 1861 et seq. does not mandate that grand jury forepersons represent a fair cross-section of the community. *United States v. Perez-Hernandez,* 672 F.2d 1380, 1385 (11th Cir.1982). Hence, we deny Newell's motion.

An appropriate order shall issue denying defendants' post-trial motions.

---

**5.** A similar challenge was made in *United States v. O'Looney,* Cr. No. 81–260 (E.D.Pa.), Judge Hannum, who presided over *O'Looney,* apparently denied defendant's motion. The basis for the denial, however, does not appear from the record.