UNITED STATES of America

v.

DICKENS, Albert, Appellant.

UNITED STATES of America

v.

PITTMAN, Fred, Jr., Appellant.

UNITED STATES of America

v.

WASHINGTON, James, Appellant.

UNITED STATES of America

v.

PERSONS, Lonnie, Appellant.

UNITED STATES of America

v.

UPSHAW, Dewey, Appellant.

UNITED STATES of America

v.

COOPER, Robert, Robert Cooper, a/k/a Mubarak Rai Ali, Appellant.

UNITED STATES of America

v.

MONROE, Keith, Appellant.

UNITED STATES of America

v.

CONERLY, Alvin, Alvin Conerly, also known as Hijr, Appellant.

UNITED STATES of America

v.

LAWSON, Willie Lee, Willie Lee Lawson, a/k/a Acqueel, Appellant.

UNITED STATES of America

v.

GREY, Claude, Ahmed Muhammad, a/k/a Claude Grey, Appellant.

UNITED STATES of America

v.

SKINNER, Raymond, Raymond Skinner, also known as Rafeeq, Appellant.

UNITED STATES of America

v.

THOMPSON, Walton Earl, Appellant.

UNITED STATES of America

v.

CLARK, James, Appellant.

UNITED STATES of America

v.

BRUNSON, James, Appellant.

UNITED STATES of America

v.

KREPS, Sheldon, Appellant.

UNITED STATES of America

v.

MOSES, Rosco, Appellant.

UNITED STATES of America

v.

DICKENS, Ronald, Appellant.

Nos. 82–5063 to 82–5079.

United States Court of Appeals, Third Circuit.

Argued Oct. 18, 1982.

Decided Dec. 15, 1982.

As Amended Jan. 27, 1983.

Certiorari Denied April 18, 1983. See 103 S.Ct. 1792.

768

Theodore V. Wells, Jr. (argued), Lowenstein Sandler Brochin Kohl, Fisher & Boylan, Roseland, N.J., for appellant Albert Dickens; Lance Cassak, Deanne Plank, Roseland, N.J., on brief.

Daniel A. Williamson, Thomas & Williamson, P.C., Elizabeth, N.J., for appellant Fred Pittman, Jr.

Albert S. Pannullo, Bloomfield, N.J., for appellant James Washington.

Sandra D. Helbig, West Orange, N.J., for appellant Lonnie Persons.

William C. Brummell, Brantley & Brummell, East Orange, N.J., for appellant Dewey Upshaw.

Louis L. D'Arminio, Breslin, Herten & Le Pore, Hackensack, N.J., for appellant Robert Cooper, a/k/a Mubarak Rai Ali.

Peter S. Valentine, Schutzman & Valentine, Irvington, N.J., for appellant Keith Monroe.

Peter R. Sarasohn, Ravin & Kesselhaut, West Orange, N.J., for appellant Alvin Conerly, also known as Hijr.

Craig V. O'Connor (argued), O'Connor & Blauvelt, Morristown, N.J., for appellant Willie Lee Lawson, a/k/a Acqueel.

Melvin D. Lusane, Newark, N.J., for appellant Ahmed Muhammad, a/k/a Claude Grey.

James Jude Plaia, Montclair, N.J., for appellant Raymond Skinner, also known as Rafeeq.

John P. McDonald, McDonald & Rogers, Somerville, N.J., for appellant Walton Earl Thompson.

James J. McDonald, Bannon, Rawding, Nutly & McDonald, Verona, N.J., for appellant James Clark.

Jill S. Slattery (argued), Nardino & Slattery, Montclair, N.J., for appellant James Brunson.

Anthony Benevento, Fontanella & Benevento, Totowa, N.J., for appellant Sheldon Kreps.

Stephen J. Edelstein, Craig & Edelstein, P.A., West Caldwell, N.J., for appellant Rosco Moses.

Steven Menaker, Miller & Menaker, Jersey City, N.J., for appellant Ronald Dickens.

Samuel Rosenthal (argued), First Asst. U.S. Atty., Newark, N.J., for appellee.

Before WEIS, BECKER and VAN DUSEN, Circuit Judges.

## OPINION OF THE COURT

VAN DUSEN, Senior Circuit Judge.

In November of 1981 a jury convicted all 17 defendants of numerous violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1968 (1976 & Supp. IV 1980). In this appeal, defendants challenge their convictions and claim that the Government drafted and prosecuted the indictment in a manner calculated to "chill" their First Amendment rights. They also contend that the district court erred in failing to question each prospective juror concerning his attitude toward Black Muslims and brutal murders of law enforcement officers, in failing to instruct the jury that the defendants' race and religion were irrelevant and impermissible factors to consider during jury deliberations, and in failing to compel each of their lawyers to participate in the trial, even though the defendants had specifically directed their lawyers to do nothing. Several defendants have also raised issues pertaining only to them. After careful review of the record in light of applicable law, we affirm.

I.

An indictment, returned by a federal grand jury in New Jersey and consisting of 19 counts, charged defendants with a concatenation of 17 robberies committed in violation of the RICO statute to finance the purposes and aims of the "New World," a religious organization characterized by its members as a continuation of the Black Muslims.[1] The first count of the indictment charged defendants with conspiracy to violate the RICO statute; the second count, a substantive violation thereof.[2] Counts 3, 5, 7, 9, 11, 13, 15 and 17 charged the defendants with bank robbery.[3] Counts 4, 6, 8, 10, 12, 14, 16 and 18 charged them with placing the lives of bank employees and customers in jeopardy by using guns.[4]

After the court denied several pre-trial motions,[5] defendants Upshaw and Albert

---

1. The indictment originally named 18 defendants. Aubrey Brown pleaded guilty to Count 1 of the superseding indictment. The district court dismissed the remaining charges against him.

2. *See* 18 U.S.C. §§ 1962(d) and 1963(a).

3. *See* 18 U.S.C. §§ 2113(d) and 2.

4. *See* 18 U.S.C. §§ 2113(a) and 2.

5. All of the defendants, except Monroe, individually filed several pre-trial motions and/or joined in the pre-trial motions filed by the other

defendants. The motions included one to dismiss the indictment on First Amendment grounds, to dismiss the indictment based on double jeopardy, to sever the counts, to sever the defendants, to strike language from the indictment, to transfer venue, to suppress evidence, a request for a bill of particulars, and a request that no court proceedings be conducted on Fridays.

The district court heard argument on the various motions on October 21, 1981. The defendants voluntarily withdrew their request that no proceedings be conducted on Fridays. The court reserved a decision on the motions to

Dickens, through counsel, stated that thereafter they would not participate in the proceedings. Dickens requested permission to remain in his cell and to allow his lawyer to observe the trial (N.T. 137a).[6] Each of the other defendants joined in Dickens' request (N.T. 140a–205a). The district court carefully questioned each defendant concerning his understanding of the consequences of such a decision.[7]

Trial commenced on October 28, 1981. The district court, after examining each defendant again to determine if he still wished to waive his right to participate

suppress evidence until a hearing had been conducted with respect to the specific evidence. *See* n. 23.

The district court granted in part the request for a bill of particulars filed by defendants Cooper, Persons, and Thompson and denied all other motions made individually or collectively by the various defendants.

6. All references to the trial transcript have been designated by "N.T." Any references to pre-trial or sentencing matters are cited to the appendix.

7. These colloquies between the court and defendants and counsel consume more than 100 pages of transcript. The following is typical:

"THE COURT: Now, the next question is, your lawyer says that you don't wish to attend the trial and you don't wish him to participate in the trial. Is that so?

"MR. DICKENS: Yes. What I'm saying here is that being that I can't say anything, being that I can't cross-examine or am not going to take any part in it, he and I will just be sitting here and he probably has things to do. And it wouldn't do me any good to sit here. That is why I say I might as well clear myself if your Honor says that's all right.

"THE COURT: Well, I want to be sure that I understand what you want.

"MR. DICKENS: I would prefer.

"THE COURT: Because this whole proceeding, this whole building here, this whole courtroom here and this Judge sitting here and that jury box, which is empty but which next Wednesday would be full, is not here for my pleasure. It is for you. They are all here to guarantee you your rights.

"My function, the jury's function, this whole courtroom's function, is to make sure that you get a fair trial and that you can't be convicted except under certain circumstances.

"Only you can waive these things, Mr. Dickens, and no one can force you to take them. I think you would be entirely foolish to waive them. I think you would be making a terrible mistake to waive them. I urge you not to waive them, but that's your choice.

"The point is, I'm not forcing you to do anything. But I want to make absolutely certain that you really know what you want to do, and I want to make certain that I understand what it is you want to do.

"Now, is all that clear to you?

. . . . .

"THE COURT: I heard what you said. All I can tell you is, the government has charged you with certain criminal activities. Under the law, you are presumed to be innocent of every one of them. Right now, as you stand here right now, you are presumed to be innocent.

"Next Wednesday, when the jury comes in, I will tell them that you are presumed to be innocent. It will be the burden of the government to prove beyond a reasonable doubt that you are guilty. To do that, the government is going to have to call witnesses and produce evidence.

"If you are not here, if you don't permit your attorney to participate, if you don't want to participate, this is your right, too. No one can force you to. But, you must understand that the presumption of innocence is not likely to stand as much . . . of a barrier between you and a conviction if you let the government do anything it wishes to in this courtroom.

"Have I made myself clear to you?

"MR. DICKENS: Yes, sir.

. . . . .

"THE COURT: Have you heard everything that I said to each one of [the other defendants]?

"MR. UPSHAW: Definitely.

"THE COURT: You have understood it all?

"MR. UPSHAW: Yes, sir.

"THE COURT: Has anybody made any threat to you or promised you or in any way pressured you or inveighed upon you to do this?

"MR. UPSHAW: No, sir.

"THE COURT: Well, it is ridiculous for me to keep repeating the same thing over and over and over again, if you have already heard it. But, nonetheless, I look at you and I tell you eye to eye, if you do this it will be the same as if you would be convicted. You would have no possible defense. You will stand stripped in this courtroom of every constitutional right that the Constitution gives you.

"You will in effect lose the right to trial by jury, you will lose the right under the Sixth Amendment to be represented by counsel, the right to call witnesses, the right to challenge evidence. You will be throwing it all into the fire. Do you understand that?

"MR. UPSHAW: Yes, sir. . . ."

N.T. 134–35a, 136a, & 151–52a.

actively in the trial, advised each one that he could change his mind at any time. All of the defendants declined to do so (N.T. 15–32). The district court then found that the defendants had made a knowing, intelligent and voluntary waiver of their rights (N.T. 32).[8]

Thereafter the jury heard testimony from 54 Government witnesses, who testified to the following scheme: From his cell in Rahway State Prison, defendant Albert Dickens assumed leadership as "lord" of the New World of Islam (N.T. 271–75, 690, 708–90, 982–83). Assisted by defendant Monroe, he recruited other inmates to commit armed robberies or "missions." Participants received a small share or "blessings," of the stolen money or "gold," which they pooled to finance the purchase of land in South Carolina, where they intended to establish a separatist community. The New World organized its members within a paramilitary hierarchy, which consisted of ranks ranging from "general," "major," "minister," and "captain" to "lieutenant" and "soldier" (N.T. 796).

The robberies or "missions" followed a general pattern consisting of one or more persons who guarded the door, others who jumped the bank counter for the "gold" and another who drove the getaway vehicle, usually abandoned for a switch car where the participants changed clothing (N.T. 431–32, 677–80, 703–07, 734). Following two rehearsal robberies at Cooper's Liquor Store and Smitty's Bar, the New World conducted at least 12 armed robberies within the next seven months.[9] During the heist at the Howard Savings Bank in Newark in November of 1980, an exchange of gunfire felled police officer John Gottfried. Defendant Lawson kicked and shot the mortally wounded Gottfried three or four more times while the officer lay on the floor of the bank. Then Lawson took Gottfried's gun and shot him again (N.T. 780–81).

On November 5, 1981, after hearing six days of testimony, the jury returned a verdict of guilty against all defendants on all remaining counts.[10] From the judgments of conviction defendants appeal.

8. The district court ordered all defendants on trial to remain in the building where they could listen to the proceedings from their cells (N.T. 44). Although the defendants refused to have their counsel participate at the trial, this court was advised at oral argument as follows:

"JUDGE WEIS: Before we get into the heart of the argument, Mr. Wells, I am curious, the defendants would not allow any participation by counsel at the trial—

"MR. WELLS: That is correct, your Honor.

"JUDGE WEIS: Have they given permission for the appeal?

"MR. WELLS: Yes, they have. I would, after Mr. O'Connor speaks, want to address one issue and that is the issue that Mr. O'Connor has raised on behalf of Mr. Lawson, which is that error was committed by not appointing counsel to put in a defense over the defendant's objections. My defendant has not joined in that issue. I do not believe that the majority of the defendants have joined in that issue. Mr. O'Connor, as I understand, has been able to get his client to permit him to do it and I believe some other counsel have joined, though I suspect, and I am not sure, whether they have joined with the express permission of their clients or because they feel, as officers of the court, what took place was wrong and that they should have the right to call this to the court's attention."

9. The robberies occurred at the following New Jersey banks: First National State Bank in Newark on July 2, 1980; University Savings and Loan Association in North Brunswick on August 28, 1980; First National State Bank in Newark on October 17, 1980; Howard Savings Bank in Newark on October 24, 1980; Berkely Federal Savings and Loan Association in Newark on October 30, 1980; First National State Bank in Newark on November 12, 1980; National State Bank of Elizabeth in Hillside on November 19, 1980; Howard Savings Bank in Newark on November 28, 1980; National State Bank of Elizabeth in Elizabeth on December 2, 1980; Howard Savings Bank in Irvington on December 11, 1980; Broad Street National Bank in Lawrence Township on December 18, 1980; and Montclair Savings Bank in Montclair on April 14, 1981.

10. The jury convicted the defendants of the following counts: Albert Dickens of 1 through 18; Pittman of 1 through 6 and 9 through 14; Washington of 12, 3, 7, 8 and 13 through 18; Persons of 1, 2, 7, 8, 15 and 16; Upshaw of 1 through 4; Cooper of 1, 2, 5, 6, and 9 through 14; Monroe of 1 through 4; Conerly of 1 through 6 and 9 through 14; Lawson of 1, 2, 5, 6 and 9 through 12; Grey of 1 through 6 and 9 through 12; Skinner of 1, 2, 7, 8 and 13 through 18; Thompson of 1, 2, 13, 14, 17 and 18; Clark

## II.

### The First Amendment Claim

Defendants contend that the district court erred in refusing to dismiss the indictment or, alternatively, to direct the Government to redact Counts 1 and 2, which alleged that the defendants' criminal enterprise operated within the framework of the New World. According to defendants, the indictment's repeated references to the New World religious organization impermissibly "chilled" and infringed upon their First Amendment rights and, in effect, placed their unpopular religious beliefs on trial. The drafting of the indictment and the presentation of the prosecution forced defendants to choose between participation in the trial on one hand and preservation of their First Amendment rights on the other, defendants argue, even though the Government could have used a less restrictive alternative by phrasing the RICO enterprise as a group of individuals who had associated for the purpose of committing robberies.

■ The First Amendment, which guarantees individuals freedom of conscience and prohibits governmental interference with religious beliefs, does not shield from government scrutiny practices which imperil public safety, peace or order. *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *Davis v. Beason,* 133 U.S. 333, 10 S.Ct. 299, 33 L.Ed. 637 (1890).[11] For example, in *Reynolds v. United States,* 98 U.S. 145, 25 L.Ed. 244 (1878), the Supreme Court, denying Mormons exemption from anti-bigamy laws, held that overtly criminal conduct could not be justified as religious practices. *See also United States v. Starks,* 515 F.2d 112, 124 (3d Cir.1975), *aff'd in relevant part sub nom. Abney v. United States,* 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977) (no exception in Hobbs Act to sanction extortions committed for religious purposes).[12]

■ On the other hand, although the Government has a compelling interest in enforcing its criminal laws and vindicating violations thereof, where that purpose directly or indirectly imposes a substantial burden upon protected First Amendment rights the Government must accomplish that goal with the least restrictive means. *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); *Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). For example, in *United States v. Robel,* 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967), the Government charged the defendant with a violation of the Subversive Activities Control Act of 1950, 50 U.S.C. § 784(a)(1)(D), which interdicted employment in a defense facility by anyone belonging to a "Communist-action" organization. The Supreme Court sustained the defendant's challenge to the constitutionality of the statute, which it found overbroad in its proscription of legal as well as illegal association. The Court concluded:

of 1, 2 and 13 through 16; Brunson of 1, 2, 7, 8, 15 and 16; Kreps of 1, 2, 7, 8 and 15 through 18; Moses of 1, 2, 7, 8 and 15 through 18; and Ronald Dickens of 1, 2, 7, 8, 15 and 16.

11. The defendants' refusal to participate also precluded the district court from conducting the inquiry mandated by *Africa v. Commonwealth of Pennsylvania,* 662 F.2d 1025, 1029–30 (3d Cir.1981), which held that

"two threshold requirements must be met before particular beliefs, alleged to be religious in nature, are accorded first amendment protection. A court's task is to decide whether the beliefs avowed are (1) sincerely held, and (2) religious in nature, in the claimant's scheme of things."

Defendants have failed to make the "required showing" of sincerity in, and religious nature

of, their New World beliefs to invoke the aegis of the First Amendment. *Id.* at 1030. Whether, as a consequence, defendants can now raise the First Amendment claim need not be reached inasmuch as the structuring and prosecution of the indictment did not impermissibly chill or infringe upon those rights.

12. Defendants do not justify their conduct as religious practice or as civil disobedience to morally unjust laws. Also, the defendants have not shown how "the free exercise of religion" guaranteed by the First Amendment will be "abridged" by preventing persons violating criminal laws from being tried therefor. *See, for example,* L. Tribe, *American Constitutional Law,* chap. 14, particularly sections 14–7 & 14–11 (1978 ed. and 1979 Supp.).

"[W]hen legitimate legislative concerns are expressed in a statute which imposes a substantial burden on protected First Amendment activities, Congress must achieve its goal by means which have a 'less drastic' impact on the continued vitality of First Amendment freedoms." *Id.* at 268, 88 S.Ct. at 425.

 Whether the First Amendment requires the Government to draft or prosecute an *indictment,* resisted by the accused as an impermissible "chill" upon his religious beliefs, by the least restrictive alternative need not be decided inasmuch as the testimony at trial clearly demonstrated that the Government could not, without seriously compromising the truth or withholding important probative evidence, have presented this case in any other manner which would have restricted the defendants' claimed First Amendment rights to any lesser degree.

Defendants do not contend that the RICO statute itself or that *any* mention of the New World in the indictment or at trial impermissibly burdened their First Amendment rights. According to defendants, the constitutional violation occurred with the structuring of the indictment and the prosecution during trial in a manner which made the organization and goals of the New World central to the Government's proof.

Under the circumstances of this case, the Government, in enforcing the RICO statute, could not have used "less restrictive" means. To secure a conviction under RICO, the Government needed to prove the existence of an "enterprise" and a connected "pattern of racketeering activity." [13] An enterprise can be proved by evidence that individuals not only associated together through a formal or informal "ongoing organization" but also functioned as a "continuing unit" for a common purpose of engaging in a course of conduct. A pattern of racketeering activity can be proved by evidence of the defendants' participation in the required number of racketeering acts committed by the enterprise. *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981). *See also United States v. Boffa,* 688 F.2d 919, at 923 (3d Cir.1982) ("[t]o establish a 'pattern' of racketeering activity, the Government must prove that at least two of these acts occurred within a ten-year period").

The Government defined the instant enterprise as "a group of individuals ... [who] operated within the framework of the New World [and were] dedicated to the organized practice of armed robbery." The indictment did not claim that the New World was the enterprise but that the New World provided a structure or "formal organization" therefor. Testimony elicited at trial showed that the defendants planned many of the crimes at New World headquarters, recruited participants from the ranks of the New World and described and justified their activities with New World jargon such as "missions," "blessings," and "gold." Many of the defendants' lawyers, introducing themselves to the jury, referred to the defendants by their Muslim names. Many of the witnesses only knew the defendants by their Muslim names. The New World objective—establishment of a separatist community in South Carolina—provided the enterprise's "common purpose." [14]

---

13. The term
"(4) 'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity;

"(5) 'pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity; ...."
18 U.S.C. § 1961.

14. Given these circumstances, the district court did not abuse its discretion in refusing to redact "paramilitary" and "separatist" from the indictment.

The comment of Rosalie McGill, one of 54 witnesses, is not sufficient to demonstrate that racism permeated the trial. McGill testified at trial that she overheard defendant Pittman say that he and the other defendants were "taking from the beast what was rightfully theirs." The "beast," she explained, referred to white people (N.T. 1117).

The district court specifically found that the references to the New World could not have been omitted:

"[I]n light of the testimony which I have heard now from ... some five witnesses, it would have been impossible for the government to present this case without any reference to the New World of Islam or to the ranks of the organization or to the roles within that organization of various people on trial here.

\* \* \* \* \* \*

After all, those who claim to have been—numerous persons claim to have been members of this organization and when they give the kind of testimony day after day, then the government had no alternative but to bring such an indictment and to bring forth such evidence in a public courtroom and as I have ruled pretrial, and I am now confirmed in that ruling by what I have heard at trial...." (N.T. 1089–91)

Under these circumstances, the district court did not err in refusing to dismiss or redact the indictment.

### Voir Dire

Defendants also claim that the district court committed plain error in failing to ask voir dire questions aimed at determining whether the prospective jurors could decide impartially a criminal case involving Black Muslims accused of armed robberies, one of which involved the brutal murder of a policeman.

■ Although the district court specifically requested the defendants to submit voir dire questions, they did not. The district court read to the jurors the indictment, which contained references to the New World and its organization and purpose, as well as defendants' Muslim names. The court also asked each juror questions such as these:

Do you know of any reason why you couldn't be fair and impartial?

Would you be able to fairly judge the guilt or innocence of these defendants even if they elect not to participate?

In other words, would you be able to understand they are presumed to be innocent? And they have to do nothing in their defense?

(N.T. 114). The district court did not mention that the case involved the brutal murder of a policeman.[15]

■ Although the Constitution does not require, by its explicit wording, that prospective jurors be questioned concerning possible racial or religious bias, *Ristaino v. Ross,* 424 U.S. 589, 96 S.Ct. 1017, 47 L.Ed.2d 258 (1976), the Supreme Court, in its supervisory capacity over federal courts, has ruled that where a defendant requests such an inquiry, the trial judge should do so, *Rosales-Lopez v. United States,* 451 U.S. 182, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981), particularly where the circumstances suggest a "significant likelihood that racial prejudice might infect [the] trial." *Ristaino v. Ross,* 424 U.S. at 596, 96 S.Ct. at 1021. *See also Ham v. South Carolina,* 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973) (the trial court might have asked such a question in light of the defendant's contention that the indictment constituted retaliation for his civil rights activities).

In the case at bar, the defendants contend that, in light of the prior state prosecutions for the predicate offenses, the Government pressed these RICO charges as a means to try the admittedly racist New World organization. Hence, a question relating to racial prejudice would have been proper. However, at trial the defendants failed to request such a question. Coupled with the district court's general inquiries relating to bias, omitting to ask this specific

---

**15.** The district court might have asked the jurors whether the brutal murder of a law enforcement officer would have affected their ability to reach a fair and impartial verdict. One juror sent the judge a note which expressed his inability to do so. The district court dismissed him from service (N.T. 262). In view of the district court's general invitation to voice any impediment which jurors might have in rendering an unbiased verdict (N.T. 157) as well as the defendants' failure to request such an instruction, this omission did not constitute plain error.

question during voir dire did not constitute an abuse of discretion. *See United States v. Leftwich,* 461 F.2d 586 (3d Cir.), *cert. denied sub nom. Wright v. United States,* 409 U.S. 915, 93 S.Ct. 247, 34 L.Ed.2d 178 (1972) (pre-trial request for such a question must be renewed at time of voir dire).

### Jury Instructions on Religious or Racist Views

■■■■ The defendants next contend that the district court committed plain error in failing to instruct the jury to refrain from considering defendants' Islamic religion or racist views in reaching its verdict. Defendants fail to cite any decision which holds that such an omission ipso facto violates defendants' due process or First Amendment rights.

Although the district court directed defendants to submit points for charge, defendants did not request the district court to give such an instruction then or immediately prior to jury deliberation, as required by Fed.R.Crim.P. 30. In its interpretations of this rule, this court has concluded that, unless there has been a timely objection at trial, a defendant cannot raise the issue on appeal unless he can show that the error in the instruction was "such as to involve a manifest miscarriage of justice." *United States v. Provenzano,* 334 F.2d 678, 690 (3d Cir.), *cert. denied,* 379 U.S. 947, 85 S.Ct. 440, 13 L.Ed.2d 544 (1964). *See also United States v. Grasso,* 437 F.2d 317, 320 (3d Cir. 1970), *cert. denied,* 403 U.S. 920, 91 S.Ct. 2236, 29 L.Ed.2d 698 (1971) (no "plain error"); *United States v. Restaino,* 405 F.2d 628, 630 (3d Cir.1968), *cert. denied,* 394 U.S. 904, 89 S.Ct. 1012, 22 L.Ed.2d 216 (1969) (in absence of timely objection, defendant cannot raise issue on appeal "unless he establishes that the ... charge constituted plain error"). We find no such "plain error" or "manifest miscarriage of justice" here. The district court's general instructions to the jury emphasized the importance of fairness and impartiality.[16] The district court did not abuse its discretion in failing to give this instruction. *See United States v. Bamberger,* 456 F.2d 1119, 1131 (3d Cir.), *cert. denied sub nom. Elam v. United States,* 406 U.S. 969, 92 S.Ct. 2424, 32 L.Ed.2d 668 (1972) (burden rests upon defendants to object to error at "earliest possible opportunity").

### Sixth Amendment Claim

■■■ Defendants also assign as error the district court's failure to compel defend-

---

**16.** The district court charged the jury as follows:

"Now, it is the function of the jury to determine the facts, and this, of course, should be done without prejudice, sympathy, fear or favor, and solely from a fair consideration of all the evidence in the case.

\* \* \* \* \* \*

"Now, as I have said to you repeatedly, you are to consider only the evidence in the case.

\* \* \* \* \* \*

"Now, the law presumes, ladies and gentlemen, that each defendant on trial before you is innocent of the crimes charged against him in the Indictment. And that presumption continues and must continue until it is outweighed by evidence to the contrary, and that means by evidence beyond reasonable doubt. Therefore, the presumption of innocence alone would require you to acquit a defendant unless that presumption has been overcome. And it can only be overcome when you, the jury, are satisfied of the guilt of that defendant beyond a reasonable doubt.

"Now, in this trial, as you know, the defendants have elected not to participate. They have not cross-examined or permitted their attorneys to cross-examine any witnesses. They have not presented any evidence to you, they have not testified, themselves. They have not even attended the trial.

"I have told you before that this was not because they ran away or they fled. If that were so, you might draw an inference against them. But it isn't so, and I tell you it isn't so. Therefore, you can draw no inference against them. You see, when the law says that a person is presumed to be innocent, and when the law says the burden is on the prosecution to prove guilt, it really means it. That means that a defendant doesn't have to do anything, not required to do anything.

"Now, the only way that can work is if a defendant says 'I will rely on my presumption and do nothing.' It only works if we, you and I, make it work. And the only way we can make it work is for you not to consider in any way, shape or form in reaching your decision as to guilt or innocence the fact that the defendants elected to rely on the presumption of innocence that the law, your law and my law, your country and my country, give them."

(N.T. 1400, 1404, 1405–07)

ants' counsel to participate in the trial, despite each defendant's express direction to his lawyer to the contrary. The defendants claim that the court's refusal violated the public's right to a fair trial and the defendants' rights to due process and effective assistance of counsel.[17] The district court, granting the defendants' request to be absent, reasoned that requiring disruptive behavior from the defendants to justify exclusion from the courtroom made little sense but requested counsel for each defendant to remain in court throughout the trial on a "stand-by" basis. Unlike many situations, in which the defendants desire to represent themselves, the defendants in the case at bar did not wish anyone, including themselves, to represent their interests. They preferred, instead, to rely upon the presumption of innocence. Thus, cases relied upon by the defendants, dealing with lack of counsel or the parameters of self-representation, can be distinguished. *Mayberry v. Pennsylvania,* 400 U.S. 455, 91 S.Ct. 499, 27 L.Ed.2d 532 (1971), for example, approved the appointment of stand-by counsel for a defendant who chose to represent himself. The concurring opinion of Chief Justice Burger, upon which defendants rely heavily, simply noted that the appointment of stand-by counsel to represent a recalcitrant defendant, whose uncensored and unrestrained exclamations to the trial judge resulted in a finding that the defendant was in contempt of court, rested within the sound discretion of the trial judge; the Sixth Amendment did not require as much. *Id.* at 468, 91 S.Ct. at 506. No other justice joined in this concurrence, which antedated *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).

Recognizing a defendant's constitutional right to represent himself, the Supreme Court, in *Faretta,* rejected any notion that the Sixth Amendment requires a trial judge to force defendants to be represented by counsel. The Court remarked:

"The counsel provision . . . speaks of the 'assistance' of counsel, and an assistant, however expert, is still an assistant. The language and spirit of the Sixth Amendment contemplate that counsel, like the ·other defense tools guaranteed by the Amendment, shall be an aid to a willing defendant—not an organ of the State interposed between an unwilling defendant and his right to defend himself personally. To thrust counsel upon the accused, against his considered wish, thus violates the logic of the Amendment. In such a case, counsel is not an assistant, but a master; and the right to make a defense is stripped of the personal character upon which the Amendment insists. . . . An unwanted counsel 'represents' the defendant only through a tenuous and unacceptable legal fiction. Unless the accused has acquiesced in such representation, the defense presented is not the defense guaranteed him by the Constitution, for, in a very real sense, it is not *his* defense."

*Id.* at 820–21, 95 S.Ct. at 2533 (footnotes and citations omitted). The Court distinguished a defendant's right to the assistance of counsel from the state's alleged right to compel him to accept a lawyer he does not want even though

". . . in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts. But where the defendant will not voluntarily accept representation by counsel, the potential advantage of a lawyer's training and experience can be realized, if at all, only imperfectly. To force a lawyer on a defendant can only lead him to believe that the law contrives against him."

*Id.* at 834, 95 S.Ct. at 2540. *A fortiori,* if the Sixth Amendment does not require the participation of "compulsory counsel" to as-

---

**17.** The Sixth Amendment confers a personal right to a fair trial upon defendants, not the public at large, whose interests will be protected by the participants in the litigation. *Gannett Co. v. DePasquale,* 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979).

Also, we note that usually ineffective assistance of counsel claims cannot be raised on direct appeal. *United States v. Sturm,* 671 F.2d 749 (3d Cir.1982) (per curiam).

sist a defendant representing himself, then a defendant who validly waives the right to counsel and objects to a lawyer's involvement in his defense on First Amendment grounds cannot be forced to accept his services without transmogrifying the protection from restraint embodied in both Amendments into shackles of restraint.

Moreover, requiring counsel to have participated over the defendants' objections would have raised a host of other difficulties. In *Wiggins v. Estelle,* 681 F.2d 266 (5th Cir.1982), for example, the trial court compelled the defendant, who had validly waived his right to counsel, to accept a stand-by, court-appointed public defender. Although the court permitted the defendant to represent himself, stand-by counsel forcibly interposed his unsolicited assistance into the defense to the point where the court of appeals considered the intrusion a violation of the defendant's right to represent himself. Similarly, a trial court, finding that the defendant's waiver of the right to counsel was "uninformed" and therefore invalid, might deny the defendant's request to represent himself, even though he claimed that his religion prevented him from accepting a lawyer's assistance. Thereafter, the defendant conceivably might bring a civil rights action in federal court against the court-appointed lawyer to recover damages and obtain equitable relief on the grounds that the unwanted legal representation had deprived him of his protected First Amendment rights.

In the case at bar, the defendants totally rejected participation in the trial in order to protect what they considered to be their First Amendment rights. They represented to the court that they perceived a conflict between the free exercise of their religion and the defense of the indictment. The district court could not simply ignore such an assertion, however much the court may have disagreed with their legal or philosophical analysis. The district court carefully advised each defendant of the dangers and disadvantages of no representation by counsel.[18] *See United States v. Welty,* 674 F.2d 185 (3d Cir.1982). The defendants admit on appeal that their waiver of counsel was knowing, intelligent and voluntary. They clearly declared to the district court that they did not want to participate in the trial themselves or through counsel. To allow defendants to request no representation at trial and then on appeal to claim error in the court's grant thereof invites every accused haled into court to demand two trials. At the first trial he can refuse to participate, assess the prosecutor's case, await the verdict and, if unfavorable, appeal on the grounds that the court should have required his lawyer to defend him. At the second trial he can defend on the merits, having had a full preview and dress rehearsal from the first trial. *See Johnson v. United States,* 318 U.S. 189, 201, 63 S.Ct. 549, 555, 87 L.Ed. 704 (1943).

Having validly waived their right to the effective assistance of counsel, the defendants cannot complain now of the effect thereof. *United States v. Flanagan,* 679 F.2d 1072 (3d Cir.1982). The district court properly refused to require counsel to participate after defendants had made knowing, intelligent and voluntary waivers, particularly since counsel were not restrained from pointing out possible errors affecting their clients and from moving the court to rectify such errors by appropriate instructions to the jury (*see, e.g.,* N.T. 1155–59; 1168–71).

### Fourth Amendment Claim

Defendant Cooper contends that the district court committed plain error in admitting into evidence guns which police had seized in a stairwell of the apartment building where he was staying temporarily. To prevail, Cooper must show that the search was illegal and that he had an actual and reasonable expectation of privacy in the area searched. *Rawlings v. Kentucky,* 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980); *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). Assuming, *arguendo,* that Cooper's sojourn at the friend's apartment conferred upon him a legitimate expectation of privacy in the apartment itself, testimony clearly supported the district court's finding that the

---

**18.** *See supra* n. 7.

police officers discovered the weapons in a plastic bag on a staircase leading to the roof of the apartment building (N.T. 882–86). The district court found that the searched area was

"... a completely common hallway. As a matter of fact, it isn't even a hallway, a stairwell separated from the rest of the building by doors. Your photographs establish that.

"If somebody wants to run in there and throw down a bag of guns, you can hardly complain about it later on."

(N.T. 896–97)

Expecting privacy in a building staircase accessible to other tenants and the general public cannot be considered reasonable. In similar contexts, courts of appeals have rejected such claims of expected privacy where defendants have placed the seized evidence in public places. *See, for example, United States v. Reicherter,* 647 F.2d 397 (3d Cir.1981) (trash placed in a public area); *United States v. Freie,* 545 F.2d 1217 (9th Cir.1976) (per curiam), *cert. denied sub nom. Gangadean v. United States,* 430 U.S. 966, 97 S.Ct. 1645, 52 L.Ed.2d 356 (1977) (cache of marijuana in open field); and *United States v. Arboleda,* 633 F.2d 985 (2d Cir. 1980), *cert. denied,* 450 U.S. 917, 101 S.Ct. 1362, 67 L.Ed.2d 343 (1981) (aluminum foil package thrown outside apartment window onto building ledge).

The district court's finding that Cooper had no legitimate expectation of privacy in the place where he had "hidden" the guns is not clearly erroneous.

### Fifth Amendment Claim

Defendant Lawson contends that the district court committed plain error by admitting into evidence statements which he made to the Newark police.

 A *voluntary* confession does not violate a defendant's due process rights. *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). To be "voluntary," a confession must be the "product of an essentially free and unconstrained choice ...." *Culombe v. Connecticut,* 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961). To determine whether a confession meets this standard, the court must examine the totality of the circumstances under which the defendant made it. *Clewis v. Texas,* 386 U.S. 707, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967).

 In the case at bar, to establish "involuntariness," Lawson relies upon his leg wound and the length of time which elapsed between his arrest and confession. Defendant received a leg wound one week prior to his arrest. A police officer testified that the bandaged wound did not appear to need attention and that Lawson did not act as if it did. Lawson has not alleged that he asked for, and that the police denied, needed medical assistance. In addition, the lapse of nine hours between arrest and confession, alone, does not compel a finding of involuntariness. In *Haynes v. Washington,* 373 U.S. 503, 504, 83 S.Ct. 1336, 1338, 10 L.Ed.2d 513 (1963), relied upon by Lawson, the police threatened the defendant with continued incommunicado detention and promised him access to his family only if he signed an inculpatory written statement. Lawson has made no such allegations.

The district court found Lawson's confession to be voluntary, and Lawson has not shown that finding to be clearly erroneous. *See United States ex rel. Harris v. Hendricks,* 423 F.2d 1096 (3d Cir.1970).

### Severance

#### A

 Defendants Conerly, Cooper and Brunson urge that under Fed.R.Crim.P. 8(b) the Government improperly joined them as defendants and that the district court erred in failing to sever certain counts of the indictment filed against them.

Fed.R.Crim.P. 14 allows the court to sever defendants or offenses which have been improperly joined in an indictment or information. The court may grant a severance when the defendant can show that the jury could not reasonably be expected to "compartmentalize" the evidence as it relates to him, *United States v. DeLarosa,* 450 F.2d 1057 (3d Cir.1971), and that the failure to sever clearly and substantially prejudices him to the point of depriving him of a fair trial. *United States v. Reicherter, supra.* Where the Government charges multiple defendants with a single conspiracy, the

interests of judicial economy usually favor a single trial. *United States v. Jackson,* 649 F.2d 967 (3d Cir.1981). The possibility that evidence will be admissible against some but not all defendants does not require severance. *United States v. Kenny,* 462 F.2d 1205 (3d Cir.), *cert. denied,* 409 U.S. 914, 93 S.Ct. 233, 34 L.Ed.2d 176 (1972).

In the case at bar, defendant Cooper points to the brevity of the jury deliberations (four hours) to demonstrate juror confusion. Defendant Conerly finds error in the district court's failure to ascertain whether the other defendants would have testified at individual trials. Both defendants Conerly and Brunson complain that the Government named them as a participant in only one-third of the 18 robberies and, therefore, should have tried them separately.

However peripheral defendants perceive their participation, Congress intended RICO prosecutions to entrammel "even the smallest fish." *United States v. Starnes,* 644 F.2d 673 (7th Cir.), *cert. denied,* 454 U.S. 826, 102 S.Ct. 116, 70 L.Ed.2d 101 (1981). Neither a disparity in evidence nor the introduction of evidence more damaging to one defendant than another entitles the seemingly less culpable defendant to severance. *United States v. Simmons,* 679 F.2d 1042 (3d Cir.1982); *United States v. DeLarosa, supra.*

Defendant Conerly has not made any showing that his co-defendants would have testified on his behalf at a separate trial. In view of their refusal to participate in their own defense, Conerly's undocumented representations to the contrary lack credibility. Such unsupported assertions do not suffice. *United States v. Provenzano,* 688 F.2d 194 (3d Cir.1982), and *United States v. Boscia,* 573 F.2d 827 (3d Cir.), *cert. denied,* 436 U.S. 911, 98 S.Ct. 2248, 56 L.Ed.2d 411 (1978).[19]

The Government presented some evidence linking each defendant to the conspiracy. The district court did not abuse its discretion in refusing to sever these defendants. *See United States v. Somers,* 496 F.2d 723 (3d Cir.), *cert. denied,* 419 U.S. 832, 95 S.Ct. 56, 42 L.Ed.2d 58 (1974).

**B**

Defendant Albert Dickens also contends that the RICO counts should have been severed due to the prejudice necessarily resulting from introduction of evidence relating to an unpopular religious group. However, mere association with an unpopular group does not require severance. *United States v. DeLarosa, supra.* Finally, defendants Albert Dickens and Moses argue that racketeering act 9 of Count 2, which involved the brutal murder of the policeman, should have been severed. Defendants do not cite any authority to suggest that a crime committed to further a conspiracy may be too inherently prejudicial to allow presentation thereof to the jury. The district court did not abuse its discretion in refusing to sever these offenses.

### Sufficiency of the Evidence
**A**

Defendant Brunson, challenging the sufficiency of the evidence supporting his conviction, alleges that he was not present at a meeting to plan the robbery of the Newark bank and that the Government's witness never saw or heard him do any illegal act. Furthermore, Brunson argues, he was not present during a meeting to plan the Irvington bank robbery and had been assigned only the role of creating a diversion, the execution of which the Government failed to prove.

Appellate courts, confronted with such a challenge to the sufficiency of the evidence, must determine whether "substantial" evidence supports the convictions. The evidence must be viewed in the light most favorable to the Government, and all reasonable inferences must be drawn in favor of sustaining the jury's verdict. *United States v. Sturm, supra; United States v. Pearlstein,* 576 F.2d 531 (3d Cir.1978).

---

**19.** The decision to sever requires consideration of the likelihood of co-defendants testifying, the extent to which such testimony would be exculpatory, the extent to which the testifying co-defendant could be impeached, and judicial economy. *United States v. Rosa,* 560 F.2d 149 (3d Cir.) (en banc), *cert. denied sub nom. United States v. Sica,* 434 U.S. 862, 98 S.Ct. 191, 54 L.Ed.2d 135 (1977).

In the case at bar, Government witness John Smith, a member of the New World of Islam, placed defendant Persons but not defendant Brunson at the meeting to plan the Newark bank robbery (N.T. 966). Smith testified that Brunson had been assigned to assist Persons in creating a diversion. On the day of the robbery Brunson travelled with co-defendants to Newark and later he and Persons reported back to those conducting the bank robbery that "everything looked all right" (N.T. 976). The bank robbery then took place (N.T. 977–78).

A similar factual pattern occurred with the robbery of the Irvington bank. Smith testified that Persons but not Brunson attended the planning meeting, that Persons and Brunson had been assigned the responsibility of creating another diversion, that Brunson was present near the bank with co-defendants who participated in the actual robbing of the bank and that Brunson and Persons returned to the bank and signaled that everything was "all right." The Government presented no testimony that the diversion—a bomb scare at a nearby school—occurred (N.T. 1022–23). Defendant Brunson did attend two other meetings to plan robberies which co-defendants later aborted (N.T. 1033–35; 1041–42). From this testimony the jury could reasonably infer that Brunson knew of the robbery plans and participated therein. Therefore, viewing the evidence in the light most favorable to the Government, we find that substantial evidence supports the jury verdict against Brunson.

### B

Defendant Thompson, also challenging the sufficiency of the evidence supporting his conviction, contends that the Government failed to prove that he participated in two acts furthering the enterprise's pattern of racketeering activity. Thompson admits his participation in the Elizabeth bank robbery but claims that the evidence does not show his involvement in the robberies at Miller's Rentals or the Broad Street Bank, Trenton.

Two men wearing ski masks robbed Miller's Rental on December 24, 1980, allegedly while defendant Thompson was incarcerated. Testimony at trial limited Thompson's involvement to his presence in a car with co-defendants who were looking for a getaway car to steal. The Government presented no testimony that Thompson actually participated in the theft of the vehicle or exactly when the car was stolen (N.T. 1053–54; 1293).

The Government also presented testimony that he saw defendant Skinner meet with Thompson to discuss the robbery of the Trenton bank. The witness did not hear the actual conversation between the defendants (N.T. 1048).

Section 1961(5) requires at least two acts of racketeering activity to comprise a "pattern" thereof. *In United States v. Palmeri*, 630 F.2d 192, 203 (3d Cir.1980), cert. denied, 450 U.S. 967, 101 S.Ct. 1484, 67 L.Ed.2d 616 (1981), this court held that the Government

"... may link a particular defendant to that pattern [of racketeering activity] by producing evidence that shows his knowledge and participation in the scheme.... To obtain convictions, it also had to prove that each defendant was voluntarily connected to that pattern and performed at least two acts in furtherance of it."

The jury could have reasonably inferred from Thompson's meeting with Skinner that the two had discussed and planned the Trenton bank robbery. The jury also could have inferred that the ambiguous use of the word "they" in connection with the Miller's Rental robbery included Thompson. Admittedly, on cross-examination, these inferences may have been refuted or proven untenable. However, defendant Thompson did not test the credibility, question the accuracy or clarify the ambiguity in the testimony of Government witnesses.[20] In

---

**20.** The Government conceded that Thompson was in jail on the day of the robbery. However, the Government did not contend or introduce any testimony to show that Thompson

participated in the robbery. Rather, the only testimony presented by the Government linked Thompson to the defendants' efforts to steal a getaway car for the robbery a few days earlier.

addition, neither Brunson nor Thompson moved for judgments of acquittal and, therefore, they failed to preserve their right to challenge the sufficiency of the evidence supporting the charges in the indictment. *See United States v. Manos,* 340 F.2d 534 (3d Cir.1965). We have examined the record and, viewing the evidence against Brunson and Thompson in a light most favorable to the Government, we find no "plain error or defects affecting substantial rights." See Fed.R.Crim.P. 52(b).[21]

C

 Defendants Persons and Monroe contend that the Government failed to prove any connection between the enterprise and interstate commerce. Section 1962(c) requires that the enterprise engage in or conduct activities which affect interstate commerce. *See United States v. Vignola,* 464 F.Supp. 1091 (E.D.Pa.), *aff'd,* 605 F.2d 1199 (3d Cir.1979), *cert. denied,* 444 U.S. 1072, 100 S.Ct. 1015, 62 L.Ed.2d 753 (1980). The enterprise, not the individual defendant, must be engaged in or affecting interstate commerce. *United States v. Jo-*

*seph,* 510 F.Supp. 1001 (E.D.Pa.1981), *citing United States v. Vignola, supra.* Even a minimal nexus will satisfy the statutory requirement. *United States v. Mazzio,* 501 F.Supp. 340, 342 (E.D.Pa.1980), *citing United States v. Rone,* 598 F.2d 564 (9th Cir. 1979), and *United States v. Nerone,* 563 F.2d 836 (7th Cir.1977). In the case at bar, testimony at trial showed that the enterprise's activities included the racketeering acts, which admittedly had an impact on interstate commerce. Therefore, the Government established the necessary connection between the enterprise and interstate commerce.

*Other Claims*

 The defendants also claim that the district court erred in holding that the Double Jeopardy Clause does not bar successive prosecution by state and federal authorities,[22] that the district court erred in refusing to transfer the case to another district,[23] that the district court erred in failing to question jurors concerning pretrial publicity,[24] that the trial was fatally scarred by cumulative error,[25] and that the

---

The Government did not show exactly when the defendants stole the car, and as the district court noted, the Government witness may have misstated the amount of time between the search for the car and the robbery.

In his brief to this court, Thompson suggests several questions which would have "cleared up this matter very easily." (Brief at 13) Thompson's refusal to participate foreclosed any opportunity for counsel to clarify the testimony by asking these questions. *Cf. United States v. Trotter,* 529 F.2d 806, 810 (3d Cir. 1976) ("[a] defendant may be convicted of a substantive offense which he did not himself commit if it is clear that the offense was committed in furtherance of a conspiracy of which the defendant was a member").

21. Even assuming this court had adopted the rule of the United States Court of Appeals for the Fifth Circuit that, in addition to the terms of Fed.R.Crim.P. 29 and Fed.R.Crim.P. 52(b), reversal may be required if there is a "manifest miscarriage of justice," *see United States v. Casey,* 540 F.2d 811, 814 (5th Cir.1976); *United States v. Perez,* 526 F.2d 859, 864 (5th Cir. 1976), this record does not demonstrate such a miscarriage of justice.

22. *United States v. Frumento,* 563 F.2d 1083 (3d Cir.1977), *cert. denied sub nom. Millhouse v. United States,* 434 U.S. 1072, 98 S.Ct. 1256, 55 L.Ed.2d 775 (1978), explicitly rejected this claim.

23. Defendants have failed to meet their burden of showing "substantial prejudice" occasioned by trial in the District of New Jersey. *See United States v. D'Andrea,* 495 F.2d 1170 (3d Cir.), *cert. denied,* 419 U.S. 855, 95 S.Ct. 101, 42 L.Ed.2d 88 (1974). Defendants point only to newspaper articles dealing with the apprehension of several allegedly notorious subversives about the time of the trial and fail to show any connection between such articles and the instant indictment.

24. Defendants also failed to show that these newspaper articles influenced or prejudiced the jurors against them. *See United States v. Provenzano,* 620 F.2d 985 (3d Cir.), *cert. denied,* 449 U.S. 899, 101 S.Ct. 267, 66 L.Ed.2d 129 (1980). In fact, the district court specifically asked if any juror had "heard or read anything in connection with this case..." (N.T. 145).

25. The defendants' decision to boycott the trial created numerous problems. The district court, in addition to requiring counsel to remain in the courtroom and defendants in nearby cells, repeatedly made efforts to ensure a fair trial. For example, the district court instructed the jury concerning the presumption of innocence and the Government's duty to prove all essential elements of the crimes.

The district court took the following action and made the following rulings on its own motions: The court suppressed evidence arguably inadmissible (N.T. 896–97; 1084–86).

district court abused its discretion in sentencing defendants.[26] We have reviewed the relevant testimony and applicable law and find no merit to the foregoing and all other claims[27] asserted by the defendants.

> Where a Fourth Amendment claim was only "colorable," the district court excluded the evidence (N.T. 1193). The district court held hearings to determine the voluntariness of confessions given by defendants Moses, Kreps and Conerly and suppressed Conerly's confession on its own motion as well. The district court also dismissed Racketeering Acts 3, 15, and 17 and Count 19 (N.T. 1239).
>
> In addition, the Government also took several measures to enhance the fairness of the trial. For example, the Government impeached its own witness who had misidentified a photograph (N.T. 345). The district court emphasized the witness' error to the jury (N.T. 682–83). The Government, as well as the district court, also elicited impeaching facts from Government witnesses who had prior criminal records and who had arranged plea agreements with the Government (N.T. 475–79; 824–28).
>
> Under these circumstances and on the basis of the record as a whole, the contentions of certain defendants that the trial was irredeemably marred by "cumulative error" are neither accurate nor fair comments.

**26.** Defendants contend that the district court failed to consider each defendant's individual background, criminal record, and personal history. However, the district judge specifically stated that he had done so. He also remarked:

> "THE COURT: From first to last, what impresses me about this case is that the United States Attorney is quite correct in categorizing this as an organized system of terror. There is just no doubt about it. I think in all the years that I've been involved in and around courts I've never seen anything like this. And what is terrifying about it is not simply the violence, although that is terrifying, and the guns, that is terrifying, too, and there are a lot of them, and the shotguns and the pistols and all the different kinds of weapons that can hurt people. And what is terrifying about this case is not simply the fact that these things of violence are not merely threatened, but they've actually been put into effect. The murder of an off-duty police officer. The firing of shots.
>
> "What is perhaps the most terrifying thing about this entire case is that there is no question about the fact beyond any shadow of a doubt all these terrible and terrifying things were done under the name of religion and under the rubric of righting old wrongs, even present wrongs.
>
> "And what is particularly terrifying about it is that under that rubric and under that banner these acts of terror and violence have been done in a quasi-military organization

intermingled with religious principles through which young people, young people—some of these very men—young, impressionable people have been absolutely poisoned against the entire community and unleashed like some medieval crusade ...; people who believed it didn't matter what happened to them, personally, because even if they were caught or even if they were, themselves, executed, they would go right to heaven.

> \* \* \* \* \* \*
>
> "I have attempted to treat each one of these defendants as a separate individual and to consider his background, record, motivations, personal history, criminal record and the like. But what overshadows all of this is the considerations which I have just alluded to; namely, this organized, disciplined, military organization functioning together in outright warfare." N.T. 260a–61a, 263a.

The sentences which the district court meted out fell within the maximum allowed by statute. See 18 U.S.C. § 1963(a) (maximum fine of $25,000. or imprisonment for 20 years); section 2113(d) (maximum fine of $10,000. or imprisonment of 25 years). Therefore, the matter is not generally reviewable on appeal. Roberts v. United States, 445 U.S. 552, 100 S.Ct. 1358, 63 L.Ed.2d 622 (1980) (sentencing is a function traditionally vested in the trial courts).

**27.** In addition to the contentions specifically considered in this opinion, we have also considered other claims made by each defendant as listed in the attached Appendix and reject them. Several defendants attempted to raise issues by joining in all other motions "as applicable." Such a reference is insufficient to identify a claim raised on appeal. A defendant must specify the name and district court document number, if possible, of any motion in which he desires to join. United States v. Martino, 648 F.2d 367, 395 (5th Cir.1981), cert. denied, 456 U.S. 949, 102 S.Ct. 2020, 72 L.Ed.2d 474 (1982), vacated in part on other grounds sub nom. United States v. Holt, 650 F.2d 651 (5th Cir.1981), on rehearing on the issue of forfeiture, 681 F.2d 952 (1982) (en banc) ("adopt[ing] the arguments advanced by the co-defendants in support of those issues and any other issues they raised that may apply to him ... is not an appropriate challenge ..."). See also Klobuchir v. Commonwealth of Pennsylvania, 639 F.2d 966, 971 (3d Cir. 1981) (declining to reach certain issues which appellant did not present "properly or adequately" in his brief).

## III.

In conclusion, we hold that the district court did not err in refusing to dismiss or redact the indictment and in refusing to compel counsel to participate in all discus-

sions of the defendants' objections. We also hold that, in light of all the surrounding circumstances, the district court did not abuse its discretion in failing to ask voir dire questions designed to determine jurors' racial or religious biases or to instruct jurors that the defendants' racial and religious beliefs were irrelevant to the question of their guilt or innocence. Finally, we hold that the district court did not abuse its discretion or commit plain error in its rulings upon the matters raised by defendants and enumerated in the Appendix to this opinion. Accordingly, the judgments of conviction will be affirmed.

## APPENDIX SHOWING WHICH DEFENDANTS RELIED ON THE 21 ISSUES RAISED IN THESE APPEALS

(Nos. 82–5063 to 82–5079)

Specifically, the defendants made the following claims:

*Albert Dickens* (No. 82–5063) argued that

(1) the RICO counts of the indictment and the manner in which the Government conducted the case impermissibly chilled and infringed upon the First Amendment rights of the defendants;

(2) the district court erred in failing to ask any voir dire questions aimed at determining whether the prospective jurors could be impartial in a case involving Black Muslims who murdered a policeman and robbed banks to finance the establishment of a separatist community;

(3) the district court erred in failing to instruct the jury to refrain from considering the defendants' racist and religious views in reaching a verdict;

(4) the district court erred in failing to sever the RICO counts;

(5) the district court erred in failing to sever Racketeering Act 9 of Count 2; and

(6) the trial was marred by cumulative error.

*Pittman* (No. 82–5064), by letter to the Clerk dated May 7, 1982, joined in the brief of Albert Dickens.

*Washington* (No. 82–5065), by letter to the Clerk dated March 4, 1982, also joined in the brief of Albert Dickens. By letter dated April 29, 1982, he joined in the arguments advanced by Lawson, Thompson, Cooper and Ronald Dickens insofar as "errors concerning the sentencing and procedures."

*Persons* (No. 82–5066) joined in the briefs of Albert and Ronald Dickens, the reply briefs of Albert Dickens and Conerly and also argued that

(7) the Government failed to establish the essential elements of a RICO violation.

*Upshaw* (No. 82–5067) argued the issue numbered 12, *infra.*

*Cooper* (No. 82–5068) joined in the brief of Albert Dickens and the reply briefs of Conerly and Albert Dickens by letter to the Clerk dated August 23, 1982, and argued that

(8) the district court failed to consider his claim with regard to illegally seized evidence, which should have been suppressed;

(9) the RICO prosecution violated the Double Jeopardy Clause;

(10) the district court erred at sentencing in failing to consider any factor other than the gravity of the crime; and

(11) the district court erred in failing to sever him from the other defendants.

*Monroe* (No. 82–5069) joined in the brief of Albert Dickens, argued the issues numbered 7, 9, 20 and 23, and adopted by reference the "various arguments" of co-defendants.

*Conerly* (No. 82–5070) joined in the brief of Albert Dickens, argued the issue numbered 11 and argued that

(12) the district court erred in failing to require counsel to proceed with a defense over the defendants' objections; and

(13) the defendants' waivers were ineffective in certain respects.

*Lawson* (No. 82–5071) argued the issues numbered 10 and 12 and also that

(14) the district court erred by admitting into evidence his statements to the police.

*Grey* (No. 82–5072), by letter to the Clerk dated March 3, 1982, joined in the brief of Albert Dickens.

*Skinner* (No. 82–5073), by letter to the Clerk dated May 10, 1982, joined in the brief of Albert Dickens.

*Thompson* (No. 82–5074) joined in the brief of Albert Dickens and argued that

(15) there was insufficient evidence to support his convictions on Counts 1, 2, 17 and 18 and to prove Predicate Act 13; and

(16) there was a retroactive misjoinder as to Counts 13 and 14.

*Clark* (No. 82–5075), by letter to the Clerk dated May 10, 1982, joined in the brief of Albert Dickens.

*Brunson* (No. 82–5076) joined in the brief of Albert Dickens and also argued the issue numbered 11 and that

(17) there was insufficient evidence to support his conviction.

*Kreps* (No. 82–5077), by letters to the Clerk dated March 16 and April 7, 1982, joined in the brief of Albert Dickens and point II of the brief of Ronald Dickens.

*Moses* (No. 82–5078) joined in the briefs of Albert Dickens, Lawson, Thompson, Cooper and Ronald Dickens and the reply briefs of Conerly and Albert Dickens, the issue numbered 12 and also argued that

(18) the district court should have declared a mistrial on the grounds of prosecutorial misconduct;

(19) the district court erred in refusing to strike the words "separatist" and "paramilitary" from the indictment;

(20) the district court erred in refusing to transfer the case to another district; and

(21) the district court erred in failing to question jurors on the question of pretrial publicity.

*Ronald Dickens* (No. 82–5079) joined in the brief of Albert Dickens and issues numbered 10 and 12.